FORM NLRB-5168
(2-08)

1   City of New York
2                                       Case No. 2-CA-39988
3                                            2-CA-40056
4   County of New York
5
6                **Confidential Witness Affidavit**
7
8   I, Joanna Fan, being first duly sworn upon my oath, hereby state
9   as follows:
10
11  I have been given assurances by an agent of the National Labor
12  Relations Board that this Confidential Witness Affidavit will be
13  considered a confidential law enforcement record by the Board and
14  will not be disclosed unless it becomes necessary to produce the
15  Confidential Witness Affidavit in connection with a formal
16  proceeding.[1]
17
18  My business address is 25 Market Street, New York, NY 10002.
19  My direct business telephone number is 212-577-2088.
20
21      1.   I have been sole shareholder, officer and director of

22  Preschool of America, Inc. (POA) since it opened in 2004.  There

23  are currently 12 locations of POA which serve about 800 children.

24  Underneath me, POA has two managing directors, Mego Gojka (Mego)

25  and Jill Howard (Jill).  I created the managing director position

26  around June 2009, and prior to that, the site directors reported

27  directly to me.  The managing directors work out of POA

28  headquarters at 345 42nd Street, are responsible to supervise the

29  individual directors at each POA location, called site directors,

30  and to deal with any issues that are brought to their attention

31  by parents of our students, the site directors or the employees

---

[1] **PRIVACY ACT STATEMENT**
Solicitation of the information on this form is authorized by the
National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The
principal use of the information is to assist the National Labor
Relations Board (NLRB) in processing representation and/or unfair labor
practice proceedings and related proceedings or litigation. The routine
uses for the information are fully set forth in the Federal Register, 71
Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these
uses upon request. Disclosure of this information to the NLRB is
voluntary. However, failure to supply the information may cause the NLRB
to refuse to process any further an unfair labor practice or



FORM NLRB-5168
(2-08)

1   at each site.  Mego and Jill are not assigned by me to perform

2   their duties at specified sites, but divide the work that comes

3   into the main office amongst themselves.  Underneath Mego and

4   Jill, there are the site directors, and each site has 1-2 site

5   directors.  Each individual location also has a bookkeeper,

6   assistant teachers, teachers and a cook.  The bookkeeper is

7   responsible to do the payroll for the employees at their assigned

8   site.  The time keeping system for all site employees is an

9   electronic swipe system, where each employee has an individual

10  number they enter to clock in and out.  The bookkeeper is

11  responsible to take attendance each day by recording who reports

12  late to work and who is absent from work.  I am not sure how

13  exactly each bookkeeper keeps the employees' hours.  Their hours

14  may be calculated based on the bookkeeper's records, or based on

15  the computer printout from the time clock machine.  Then, the

16  bookkeeper will submit the employees' hours to Michelle Zheng

17  (Zheng), payroll.  Zheng submits the payroll for all facilities

18  to our bank, and then she tells the bank to make the direct

19  deposits for the employees.  In addition to submitting site

20  payroll to Zheng, and recording time and attendance, each site

21  bookkeeper is responsible to give out supplies to teachers and

22  assistant teachers at the site, as needed, and to receive supply

23  orders from employees and submit that to Francis Wang (Wang).

24  All supply orders are approved and ordered by Wang POA-wide, and

25  she decides what she will order from the supply requests

26  submitted by the bookkeeper.  The bookkeeper is also responsible

representation case, or may cause the NLRB to issue you a subpoena and

2



FORM NLRB-5168
(2-08)

1   to receive tuition checks and to submit them to our accounting

2   office, Zheng and Jenny Yuen (Yuen).  Time off requests are made

3   by site employees directly to their site director, not to the

4   bookkeeper.  All requests for time off are received and approved

5   by the site director, not by the bookkeeper.  If an employee

6   needs to call in sick, the employee would call her site director.

7        2.    There is a POA site located at 101 West End (WE).  The

8   WE site opened in 2004.  From January 1, 2007 until June 2009,

9   Mego was the site director at WE.  From around June 2009 until

10  around June 4, 2010, Catherine Madaio was the site director at

11  WE.  From about June 7, 2010 to the present, Robin Mauro (Robin)

12  was the site director at WE.  Kathy Huang (Kathy) has been the

13  bookkeeper at WE since around June 2009.  The WE facility is

14  situated on two floors of a building; the bottom floor contains

15  one office, where Kathy and Robin work and one stroller room.

16  The second floor of the WE facility has about eleven classrooms,

17  a tv room, a gym, and a kitchen.  There were about eleven full-

18  time teachers and eleven full-time teacher's assistants.  There

19  were also floaters, but I do not know how many there were.

20       3.    There is also a POA site located at 1501 Lexington

21  Avenue (LEX).  The LEX site opened in 2006.  From October 2009

22  until around June 2010, the site director was Lisa Terlizzi.

23  From around June 2010 until around September 9, 2010, the site

24  director was Gail Wells. From around August 23, 2010 to the

25  present, the site director has been Gina Well.  Kelly Li has been

26  the bookkeeper at LEX since sometime in 2009.  The LEX facility

seek enforcement of the subpoena in federal court.

FORM NLRB-5168
(2-08)

1   is located on one floor, with five classrooms, one office where

2   Kelly and the site director worked, a gym, and a kitchen.  There

3   were about six full time teachers and six full time teacher's

4   assistants.  The LEX facility also staffs floating teacher's

5   assistants, but I do not know how many.

6        4.    Prior to the summer of 2010, in a one year period, I

7   was at WE and LEX on approximately two occasions.  Since the

8   creation of the managing director position around June 2009, I

9   have had very little contact with site directors.  I have varying

10  levels of communication with site directors, from site to site.

11  But usually, I am kept up on what is going on at each site by the

12  managing directors.

13       5.    All POA schools have given employees employment

14  contracts in each year that are effective from September of any

15  given year through August of the following year.  Employment

16  contracts are signed in August of each year, but I am not

17  involved in the process of giving the employees their employment

18  contract or having them sign their employment contracts.  An

19  employee's wage rate is determined by a chart, which was created

20  by me and updated by me, which determines an employee's wage rate

21  based on degree, experience and credentials.  I am not involved

22  in determining the individual wage rates for each employment

23  contract, the site director and the managing director do that

24  from my wage rate charge which each school has a copy of.  If a

25  teacher or assistant teacher is hired mid-contract term, the

26  teacher or assistant teacher will not sign an employment contract

27  until the August contracts are signed.  The site directors are

4

FORM NLRB-5168
(2-08)

1  responsible to review an employee's work for any given contract

2  year and determine whether to renew an employee's employment

3  contract for the following year.  I am not usually directly

4  involved in that process, I do not train the site directors how

5  to conduct the yearly review process, I do not determine the

6  criteria through which the employees will be evaluated, and each

7  site has their own process.  There is a site director's handbook

8  that informs the site directors that they need to perform yearly

9  employee reviews, and, except for the sit directors' handbook,

10 there is no process or criteria set out for them to perform those

11 reviews.  I do not review employee personnel files, and I do not

12 have to approve the site director's determinations of which

13 employees should be let go and which employees should receive new

14 employment contracts.  I do not tell the site directors when to

15 perform their reviews, although they should be doing the reviews

16 between June and August of each year.  I was not involved in the

17 yearly teacher and assistant teacher evaluations at WE or at LEX

18 in the year 2009, nor was I involved in the yearly teacher and

19 assistant teacher evaluations at WE or at LEX in the year 2010.

20 I know that Gail was not involved in the yearly review process at

21 LEX for the year 2010, but I do not know whether the yearly

22 individual teacher and assistant teacher reviews were done by

23 Gina or based on information left by Lisa prior to her departure.

24 Unless contacted by a director, I am usually unaware about the

25 individual employee's performance because I have not personally

26 reviewed their attendance records, ~~am not informed of discipline~~,

27 and have not seen them in their classrooms.  I do not recall how



5

FORM NLRB-5168
(2-08)

1    many contracts were not renewed for the 2009-2010 school year
2    either facility-wide or at LEX and WE specifically.

3         6.    I do not hire employees or fire employees, so I do not
4    know what they are told when they are hired about their
5    expectation of continued employment.  Usually, neither the site
6    directors, nor the managing directors report to me who they hire
7    and fire, However, the new directors of WE, LEX and Times Square
8    did communicate with me regarding the non-renewal of contracts in
9    August and September 2010.

10        7.    On or around the week of June 7, 2010, the first week
11   that Robin started at WE, she called me and I called her a few
12   times to see how she was doing.  I do not recall how many
13   conversations we had that week, but we had several.  During these
14   conversations, Robin reported some problems that she had run into
15   with the employees.  Robin told me that she was reviewing each
16   teacher and assistant teacher's personnel file and that she had
17   noticed that Anesia Lloyd, WE assistant teacher, did not have the
18   continuing education to work as an assistant teacher, as required
19   by the health code.  In addition, Robin reported to me that she
20   thought that Catherine Duran, WE assistant teacher, provided the
21   school with a fake diploma.  Further, Robin reported to me that
22   she thought a lot of the teachers did not have a good work ethic,
23   and specifically, Samantha Giordana-Grerena was absent a lot.
24   Robin said that she did not want about 10 to 12 staff members to
25   continue to work at POA, but that they all had employment
26   contracts that ran through August 2010, so she would have to wait
27   for the contracts to expire in August.  Robin told me that she

6



FORM NLRB-5168
(2-08)

1   had also reported these issues to Jill Howard.  Robin said that

2   Rena Goldstein, WE head teacher, was unable to handle her

3   classroom, and that she would like to find someone else for her

4   position as well.  Robin said that every day, Wendy Puello came

5   to work on time, but that very often, Wendy would leave her

6   assigned classroom to spend time in her son's classroom, which

7   was not her assigned classroom.  Further, Robin told me that

8   Wendy would leave school on time, but that she would leave her

9   assigned classroom well before her scheduled time and get her son

10  ready to leave.  Robin also reported problems with another seven

11  or so employees, but I do not recall which ones.  I did not

12  advise Robin on what to do with these employees, I just listened

13  to the problems.  Jill Howard spent Robin's first week, the week

14  of June 7th at WE, getting Robin situated in her new position.

15  Prior to Robin's hire, I told Robin that she was being hired, in

16  part, to correct the problems that had developed as a result of

17  mismanagement of the WE site by Catherine and excessive

18  latenesses, absences and underperformance of staff members.

19      8.   Around June 16, 2010, two men came to my office on

20  Market Street.  They identified themselves as representatives as

21  DC1707 (Union).  They gave me their business cards, one was

22  Julian deJesus, and I do not recall the other man's name.  The

23  other Union representatives whose name is unknown to me said that

24  the Union represented the WE staff because they got 24 signatures

25  of employees.  He gave me a memorandum of understanding.  This

26  document is attached hereto as Exhibit A.  I asked them what I

27  should do.  He said that their office would contact me and that I



7

FORM NLRB-5168
(2-08)

1   should hire a lawyer.  The conversation lasted about 5 minutes.

2   After the Union representatives left, I called Jill Howard.  I

3   told her that I received notice from the Union that the WE staff

4   wanted to form a Union.  I asked her if she was aware of that or

5   not.  Jill said that Catherine Madaio started this, that it must

6   be her.  I asked her how she knew that.  Jill said that in the

7   director's meeting in April, Catherine Madaio suggested that all

8   of their directors should form a Union and put up a rat in front

9   of all of POA's schools.  I hung up with Jill and called Kathy

10  Huang (Kathy) at WE, and told her that I got notice from the

11  Union that they had 24 signatures of the WE employees.  I told

12  her that Jill told me that Catherine had started this petition.

13  I asked her if she heard anything about this.  Kathy said yes,

14  she had seen Catherine talk to other employees, about union matter while Catherine

15  was still the site director at WE, in the office around April

16  2010.  Kathy said that Catherine sent her a link via e-mail about

17  a strike.  I did not see this e-mail until around September 14,

18  2010 when Kathy forwarded this e-mail to me.  Kathy told me that

19  Catherine told her that she used to work in Bright Horizon Day

20  Care Center, that Catherine had experience with the unions and

21  knows how to form them.  I hung up the phone with Kathy.

22      9.    On or around the following day, June 17, 2010, Jill

23  called me and said that she searched the internet regarding

24  unions.  Jill said that if a manager organizes a union, it is a

25  violation and the case will be dismissed.  Jill told me not to

26  worry.

8

FORM NLRB-5168
(2-08)

1     10.  On or around the following day, June 18, 2010, Kathy
2  called me again and told me that she chatted with about six of
3  the staff and no one knows anything about a union.  Kathy said
4  that this idea came from Catherine, Catherine always wanted to
5  create a union in POA schools.  I asked Kathy what Catherine's
6  intention was.  Kathy said that Catherine had an issue with the
7  staff because they were upset that we eliminated the spring and
8  winter breaks, that if POA had a union then Catherine would not
9  have to deal with the staff, the union would deal with them, and
10  that if POA had a union, then the employees would be paid more
11  and have less hours.  Kathy asked if I remembered the last time,
12  in early May 2010, when Catherine sent me a letter asking for the
13  spring and winter breaks to be reinstated.  I said that I did.
14  Kathy said that this letter was orchestrated by Catherine, and
15  typed by one of the staff.  I have attached a copy of this
16  document hereto as Exhibit B.

17     11.  I thought that out of 27 WE employees, if the union
18  had 24 signatures, and six staff members were not aware of
19  anything about a union, then how could the union have 24
20  signatures.  I thought that Catherine was forging the signatures
21  because she was fired from WE.  I do not recall whether or not
22  the petition was filed for the employees at WE by this time.

23     12.  On or around June 19, 2010, I typed up a statement,
24  dated June 21, 2010, for employees that says that they did not
25  sign anything ~~to support~~ DC 1701.  A sample of this statement is
               *about it*
26  attached hereto as Exhibit C.  I wanted to discover whether or



9

FORM NLRB-5168
(2-08)

1   not the employees had actually signed for a union or whether

2   Catherine had forged their signatures.

3       13.   On June 21, 2010, I went to the WE facility, and

4   printed out copies of the statement attached hereto as Exhibit C.

5   When I arrived at the WE facility that day, Hope Dublin (Hope),

6   assistant teacher, was in the office with Kathy and Robin.  I

7   asked Hope how things were going with the new director.  She said

8   good.  I told her that the calendar had changed, meaning that

9   there would be no more winter and spring breaks but that they

10  would receive those days as vacation days to take whenever they

11  wanted.  Hope said that she knew this and understood the change.

12  Then I told Hope that the Union told me that they had received

13  signatures of 24 employees who wanted to join the Union.  Hope

14  said that she didn't know anything about this.  I said that I

15  suspected that those signatures were forged.  Hope asked me if I

16  really thought that.  I asked her if she knew anything.  Hope

17  said no, she did not.  I gave her the form attached as Exhibit C,

18  and she signed it right there and handed it back to me.  Then I

19  went upstairs to tv room and asked Kathy to go around covering

20  classrooms and sending staff into the tv room to meet with me.

21  For about fifteen minutes in the morning, I met with about

22  sixteen staff members, individually, in the tv room.  With each

23  teacher, I would ask them how they liked Robin, the new director,

24  and explain the spring and winter break change to our vacation

25  policy, and then I would tell them that I received notice from DC

26  1707 that they got 24 signatures from our staff at WE.  I would

27  say that I suspect those signatures are forged.  I would ask if



FORM NLRB-5168
(2-08)

1  they were aware of anything like that.  Everyone said no that

2  they did not know anything about it.  All but three of the staff

3  signed.  One of the three of them, Antonette Monroe, assistant

4  teacher, left a signed form the next day with Kathy.  After I had

5  received 13 signed forms, and 13 staff members told me they

6  didn't know anything I gave Kathy blank copies and told her to

7  talk to the rest of the staff and have them sign the forms.

8      14.  The next day, around June 22, 2010, Kathy faxed me

9  about eight more signed forms.  Later on June 22, 2010, I

10  received the original charge in case No. 2-CA-39988.

11     15.  On or around July 15, 2010, a hearing was held at

12  Region 2 regarding whether or not the head teachers were

13  supervisors.  The head teachers are supervisors, it says that

14  they are in the health code.  I did not testify at the hearing.

15  For POA, Robin and Jill, and they testified that the teachers

16  were supervisors.  For the Union, WE employees, Samantha, Wendy

17  and Jenny Vasquez, head teacher, testified.

18     16.  I have been shown a copy of an internet article dated

19  February 25, 2005 and titled "The struggle for DC 1707" by the

20  Board Agent.  I have seen this article before when I found it on

21  the internet looking for information regarding the Union.  I

22  believe that I found the article on or around the date shown on

23  the bottom right hand of the article, July 18, 2010.  I made

24  handwritten notes on the sides of the article, and all of the

25  marks on this document, including the handwritten notes,

26  underlining and starring was done by me.  Around July 18, 2010, I

27  scanned in the article with my notes and writing on it and



11

FORM NLRB-5168
(2-08)

1    attached it to an e-mail to Robin, and to Gina or Kelly with the

2    instruction to put in the mailboxes of all of the staff at the WE

3    and the LEX facilities.  A copy of this article with my

4    handwritten notes on it is attached hereto as Exhibit D.

5         17.   I have been shown a copy of a document titled

6    "Questions and Answers About the Union" by the Board Agent.  I

7    recognize this document as one that was distributed to the WE and

8    LEX employees, either physically or in their mailboxes sometime

9    during July 2010.  The document was emailed to myself, Robin,

10   Gail and Kelly from our attorney.  A copy of this document is

11   attached hereto as Exhibit E.  Both Robin at WE and either Gail

12   or Kelly at LEX, told me that they distributed this document to

13   the employees.

14        18.   I have been shown a copy of a document titled "A Lot

15   To Lose" by the Board Agent.  I recognize this document as one

16   that was distributed to the WE and LEX employees, either

17   physically or in their mailboxes sometime during July 2010.  The

18   document was emailed to myself, Robin, Gail and Kelly from our

19   attorney.  A copy of this document is attached hereto as Exhibit

20   F.  Both Robin at WE and either Gail or Kelly at LEX, told me

21   that they distributed this document to the employees.

22        19.   I have been shown a copy of a flyer about Union dues

23   by the Board Agent.  I prepared this document and distributed it

24   to assistant teachers at WE in a meeting that I held at WE

25   facility on July 30, 2010.  I also distributed this document to

26   assistant teachers at LEX in a meeting that I held on or around



12

FORM NLRB-5168
(2-08)

1   August 5, 2010.  A copy of this document is attached hereto as

2   Exhibit G.

3        20.   I have been shown a copy of a flyer titled "Union vs

4   Non Union" by the Board Agent.  I have seen this document before,

5   and I know that it was distributed to the staff and WE and LEX

6   during the month of July 2010.  The document was emailed to

7   myself, Robin, Gail and Kelly from our attorney.  A copy of this

8   document is attached hereto as Exhibit H.  Both Robin at WE and

9   either Gail or Kelly at LEX, told me that they distributed this

10  document to the employees.  I also distributed the document to

11  assistant teachers at WE in a meeting that I held at WE facility

12  on July 30, 2010.  I also distributed this document to assistant

13  teachers at LEX in a meeting that I held on or around August 5,

14  2010.

15       21.   On or around July 30, 2010, around 1 p.m., I held a

16  meeting in the gym at WE for all of the WE assistant teachers.

17  It was just myself and about twelve assistant teachers.  I

18  believe that almost all of the assistant teachers were present,

19  but I do not recall their names.  I had received a list of

20  questions from Mego and Jill that employees had from a meeting

21  with Mego and Jill on or around July 27, 2010, that Mego and Jill

22  were not sure how to answer.  At my meeting, I read to the

23  employees from a document that is attached hereto as Exhibit I.

24  I also told them that I had three children living in Staten

25  Island, that I came to America with 40$ in my pocket and got my

26  masters at NYU.  I said that I worked very hard to provide a nice

27  facility and good job opportunities.  I asked them if they liked

13

FORM NLRB-5168
(2-08)

1   their new director, Robin, and if they had any issues.  They

2   responded that Robin was very strict.  They were asking me what

3   the new class assignments would be for September 2010.  I told

4   them that I did not know, but that Robin would let them know in

5   two weeks.  They talked about issues with Robin a lot, about how

6   strict she was being on them.  I recall telling them that they

7   could only talk to the Union representative, who sat in the park

8   across the street all day, during their lunch breaks, but not

9   while they were working because they should focus on their

10  children.  I also encouraged the teachers to go to continuing

11  education because the health code standards continue to get more

12  and more strict.  They asked me what their raise would be in the

13  next contract.  I told them that it depended on whether or not

14  there was a Union when it was time for new contracts because I

15  would not know what the raises would be if the Union won the

16  election.  That is all that I recall from the meeting.  The

17  meeting lasted about an hour.

18      22.   Before July 30, 2010, at least one WE parent had

19  complained to me that they saw a man in the park around their

20  children while they were in the park on the south side of 64th

21  across from the WE facility.  The man was the Union

22  representative.  Robin had also told me that she saw them talking

23  to him while they were working when they were out in the park

24  with their children.  This is why I told the assistant teachers

25  not to talk to the Union representative in the park while they

26  were working.



14

FORM NLRB-5168
(2-08)

1    23.   An election was held from 1 p.m. to 3 p.m. on August

2    2, 2010, for the assistant teachers at WE.  During these two

3    hours I was either in the office with Robin and Kathy or was

4    walking around checking the construction because we are expanding

5    into Ethan Allen store room.  I left WE around 3 p.m. or 4 p.m.

6    24.   I have been shown a copy of an August 3, 2010, letter

7    to the staff at WE signed by Robin.  I do not recognize this

8    document; I have not seen it before.  A copy of this document is

9    attached hereto as Exhibit J.  I don't recall if I had any

10   conversations with Robin about staff evaluations around this

11   time.

12   25.   On or around August 4 or 5, 2010, Robin called me and

13   said that she had decided not to renew several contracts.  I

14   recall she said that she needed to stagger them so that the

15   children had coverage.  I recall Robin saying that she would tell

16   Hope first.  I do not recall which employees Robin asked me to

17   prepare letters for, but that day I printed out and signed about
     *notified that their contracts would not be*
18   five ~~termination~~ letters for WE employees.  The only person that *renewed*.

19   I recall the printing and signing the letter for is Hope.  Robin

20   told me that she was not going to give them to everyone on the

21   same day because she needed to have the new teacher's paperwork

22   in order before she told the employees.  Kathy came to Market

23   Street and picked up the letters.

24   26.   On or around August 5, 2010, I held two meetings at

25   LEX, one meeting began around 1 p.m. and the second began around

26   2 p.m.  I held the meeting in the gym.  At the 1 p.m. meeting was

27   myself, Gina, Gail, Kelly, and about six staff members.  I do not

15



FORM NLRB-5168
(2-08)

1   know any of their names or whether they were all assistant or

2   head teachers, or mixed.  I handed out the Union vs Non Union

3   flyer, attached hereto as Exhibit H, and read the 10 questions

4   and answers to them, attached hereto as Exhibit I.  I asked if

5   they had any questions about the change of winter and spring

6   break.  No one had any questions.  I explained to them that I

7   wasn't taking away winter and spring breaks, but giving them the

8   same amount of vacation leave to use whenever they wanted.  I

9   don't recall any of the staff asking any questions.  This is all

10  I recall from the meeting.  This meeting lasted about 30 minutes.

11  Around 2 p.m., I held the second meeting at LEX in the gym.

12  Present were myself, Gail, Gina, Kelly and about six staff

13  members.  I do not know the names of the staff members or their

14  positions.  I read what is attached to my affidavit as Exhibits H

15  and I to the staff at the meeting.  I asked if they had any

16  questions, and no one did.  That is all I recall from the

17  meeting.  The meeting lasted about 30 minutes.

18      27.   The Board Agent has shown me an undated document,

19  which says that it is authored by me.  I recognize this document

20  and I remember writing it.  I recall that I sent it to Robin, so

21  it was during the time that Robin has been the WE site director,

22  but I do not recall when.  I do not know if Robin distributed

23  this document to the WE staff.  A copy of this document is

24  attached hereto as Exhibit K. 

25      28.   I do not recall when, but I prepared the ~~termination~~

26  letters for three sites who have new site directors, including

27  WE, LEX and Times Square.  I do not approve the site director's

FORM NLRB-5168
(2-08)

1   decisions, but with respect to Robin's decisions to not renew

2   each contract in August and September 2010, Robin had told me

3   that those employees had severe time and attendance problems.  I

4   do not recall their names, but for each employee whom I prepared

5   a termination letter for, I spoke to Kathy to confirm whether or

6   not these employees had time and attendance problems.  I recall

7   that Kathy confirmed that each of them did have time and

8   attendance problems.

9        29.  On or around August 23, 2010, I received a copy of an

10  article from the New York Daily News about what had been going on

11  at LEX and WE.  I received this article via fax from a site

12  director at Rego Park facility.  A copy of this article is

13  attached hereto as Exhibit L.

14       30.  When Lisa Terzelli left around June 2010, she called

15  me crying and said that LEX staff needs to be fixed, and that she

16  is quitting because she cannot deal with the staff anymore.  Lisa

17  said that she and Kelly always have to cover for the teachers

18  because they don't show up.  Lisa mentioned that those with the

19  most severe problems were Maggie (also known as Magaly Linares)

20  and Evelyn Aguirre.  When Lisa left, I knew that we were not

21  going to renew Maggie and Evelyn's contracts, but that we would

22  not take action until August 2010 to keep continuity during the

23  school year.  On or around August 23, after I had seen the

24  article, I called Kelly and asked her who Dianna DeLeon was.

25  Kelly said she's one of the baby classroom teachers.  I said how

26  her performance is.  Kelly said that she was not a good teacher,

27  and that she is always asking for a promotion but she does not

17

FORM NLRB-5168
(2-08)

1    have a bachelor's degree.  Kelly told me that Dianna hasn't had a

2    valid fingerprint since September 2009, that Dianna gave the

3    office a fingerprint receipt, but never gave the fingerprint

4    result.  Kelly said that they had requested through the

5    Department of Investigation in May 2010 and July 2010, but it

6    never came.  I asked why we couldn't get the fingerprint and

7    Kelly said that maybe it was because Dianna had been arrested

8    before.  I said that I could not keep Dianna in the school, it

9    was dangerous.  Kelly said that she did not know why Dianna said

10   in the Daily News article that Dianna had a bachelor's degree,

11   when Dianna does not really have a bachelor's degree.  I said

12   that if we don't have a fingerprint on file, the she can't work

13   because its is required by the health code 47.19.  Kelly said

14   that her attendance was not good either.  The conversation ended.

15   I drafted a letter for Dianna on August 24, 2010, and e-mailed it

16   to Gina and Kelly.

17       31.  On or around the week of August 16, 2010, Reina

18   Peralta resigned by telling everyone that she was leaving.  As

19   far as I know, she did not submit anything in writing.  On or

20   around August 25, 2010, I called Jill and told her to go to LEX

21   and give three employees' letters.  Reina was given a letter

22   informing her that she resigned and that her resignation was

23   effective on a certain date.  Reina was not terminated. I drafted

24   letters notifying Evelyn Aguirre and Magaly Linares that their

25   contracts would not be renewed, as per my conversation with Lisa

26   Terzelli on or around the time Lisa resigned, as I described in

27   paragraph 30.



18

FORM NLRB-5168
(2-08)

1    32.  On or around September 3, 2010, I drafted a letter to

2    both WE and LEX and it was distributed all staff there.  A copy

3    of this letter is attached hereto as Exhibit M.

4    33.  On or around September 7, 2010, and election was held

5    at LEX.  I was not at the LEX facility that day, but I received a

6    phone call from Gina who said that there was a rally that morning

7    at LEX.  I asked Gina what they were doing.  Gina said she would

8    fax to me a flyer saying that we fired teachers for their Union

9    activity.  In the afternoon, after the election, I called Kelly.

10   Kelly said that she was surprised that long term employees who

11   were fired voted, teachers who had quit voted, and that some head

12   teachers had voted in the election.  Kelly said that she just

13   thought it was strange and uncomfortable.  I asked her who our

14   observer at the election was.  Kelly said that it was Zoila De

15   Las Nueces, LEX head teacher.  I said that Zoila should know

16   those people and should have said something about that.  Kelly

17   said that Zoila did challenge several votes.  The conversation

18   with Kelly ended.  Based on the flyers handed out by the Union

19   that morning, I drafted an undated letter, distributed to the

20   parents at LEX.  I do not think that this letter was distributed

21   to the staff at LEX.  A copy of this letter is attached hereto as

22   Exhibit N.

23   34.  Tatiana Navia is not currently employed at any POA

24   facility.

25   35.  I have been shown three letters from the Union's

26   attorney, Harvey Mars, and addressed to POA's former attorney

27   Martin Gringer, dated August 9, 11 and 16, 2010.  I have never



19

FORM NLRB-5168
(2-08)

1   seen these documents before. I have been shown one letter from

2   the Union's attorney, Harvey Mars, and addressed to POA's

3   attorney Marc Bresky. I have never seen this document before.

4   On or around late August 2010, POA was no longer represented by

5   Gringer. During the relevant time period, POA has been

6   represented by Marc Bresky as general counsel but on or around

7   late August 2010, when Gringer was no longer POA's labor

8   representative, Joe Cacciato became our attorney for the purposes

9   of collective-bargaining. I have not had any conversations with

10   any Union representatives about negotiation dates or bargaining

11   with the Union.

12 I am being provided a copy of this Confidential Witness Affidavit
13 for my review. If, after reviewing this affidavit again I
14 remember anything else that is relevant, or desire to make any
15 changes, I will immediately notify the Board agent. I understand
16 that this affidavit is a confidential law enforcement record and
17 should not be shown to any person other than my attorney or other
18 person representing me in this proceeding.
19
20 I have read this statement consisting of 20 pages, including this
21 page. I fully understand its contents, and I certify that it is
22 true and correct to the best of my knowledge and belief.
23
24
25
26 Sworn to before me at
27 26 Federal Plaza, Room 3614
28 New York, New York this
29 23rd day of September 2010
30
31
32 Nicole Buffalano, Board Agent,
33 National Labor Relations Board
34

Joanna Flin

20

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding is made this _____ day of _____, 2010 by and between The Pre-School of America ("Employer"), having a place of business at 101 West End Avenue, New York, NY 10023 and District Council 1707, AFSCME, having a place of business at 101 Avenue of the Americas, New York, NY 10013 ("the Union").

WHEREAS, the Union has evidence of support of a majority of the proposed bargaining unit employees it employs:

NOW THEREFORE,

1.      The Employer recognizes the Union as the exclusive collective bargaining representative for all full and regular part-time head teachers, teachers, assistant teachers, teachers assistants (floaters) it employs.  Confidential employees, guards and supervisors as defined in the National Labor Relations Act are specifically excluded from this recognition agreement.

2.      The Union and Employer agree that they will engage in good faith negotiations with respect to the wages, hours and terms and conditions of employment of all teachers, assistant teachers, social service coordinators, maintenance employees and teacher aids it employs.

PRE-SCHOOL OF AMERICA                    DISTRICT COUNCIL, 1707,
                                         AFSCME, AFL-CIO


By: _____            By: _____
                                             Raglan George, Jr.
                                             Executive Director



WE CARE. WE COUNT.
**DC 1707**

Julian deJesus
Staff Organizer

District Council 1707
American Federation of State,
County and Municipal
Employees, AFL-CIO
1 Hudson Square
75 Varick Street, Suite 1404
New York, NY 10013
(212) 219-0022 Ext. 5119
Fax (212) 925-0806
Cell (201) 450-8476
jdejesus@dc1707.net

C:\HSM\1707\Memorandums\Mem of Under. Pre-School of America - DC1707-6.16.2010.wpd



GOVERNMENT
EXHIBIT
A



Dear Joanna,

It has come to our attention that as of next year you are cutting our spring break. We the teachers of Preschool of America feels this is unfair to us, from the time Preschool Of America started we have had our winter recess and spring break and to take these days from us will be demoralizing to the staff. Year around we work hard with the kids to make sure they are well developed and their basic needs are met. These vacations days give us a fresh start to our work related days. Also most of us have young kids at home as well that take these same vacation days, and some of us take spring break as a chance to celebrate our religious back ground. And these days gives us a chance to be at home with our family while they are home on break. The parents of PSA have come to expect these vacation days when they signed their kids to this establishment. With that being said we the staff of Preschool Of America is asking for our winter and spring break to be giving back to us. Especially since everyone here has been loyal to you for a long period of time.

Thank you,

*the staff*

1. Hope Dublin
2. Jennie Vázquez
3. Wendy Puello
4. Tatiana Navia
5. Maricel Almanyar
6. Ariesta Steel
7. Zuelay Richardo
8. Mel Collins
9. Jean de León

10. Sara May
11. Anna Catonelson
12. Antonette Munroe
13. Maria Elconer
14. Jenifer Devoe
15. Marie Estrada
16. Catherine Durán
17. Kalliope Reyes
18. Rena Goodstein
19. Amanda Nunes
20. Ocean Glass
21. Rebeca Camili

GOVERNMENT EXHIBIT B

June 21, 2010

To Whom It May Concern:

My name is _Mel Collins_, and I am currently working at Preschool of America, 101 West End Ave, New York, NY 10023. I never heard of DC 1701, I have no intention to join the Union, if someone had put my name for this matter that was the misrepresentation.

I have not been coerced into sign this and will not be retaliated against if I choose not to sign this.

Sincerely yours,

Mel Collins





# SOCIALIST WORKER.org

**NOTE:**
You've come to
an old part of
SW Online.
We're still
moving this and
other older
stories into our
new format. In
the meanwhile,
<u>click here</u> to go
to the current
home page.

Current issue

Sign up for
e-mail bulletins

Where we stand

Contact
Socialist Worker

Donate to
Socialist Worker

Contact the ISO

*International
Socialist Review*

SOCIALISM 2008

A weekend of
revolutionary
politics, debate
and entertainment

Featured speakers:
**JEREMY SCAHILL**
**LAURA FLANDERS**
**DAHR JAMAIL**
**SHARON SMITH**
**DAVE ZIRIN**
**BARBARA BECNEL**
**MOHAMMED OMER**
**ADRIENNE KINNE**
**JEFFREY ST. CLAIR**

With more than
100 meetings, plus
a bookfair and more

www.socialism
conference.org

Left-wing AFSCME official in NYC removed
undemocratically

## The struggle for DC 1707

By Lee Sustar and Shaun Harkin | February 25, 2005 | Page 11

NEW YORK--An outspoken official in the public-sector
union AFSCME has been removed from office
undemocratically amid a dispute over a contract ratification
vote for New York City day care workers.

Brenda Stokely, president of AFSMCE District Council
(DC) 1707, was voted out of office by union delegates in
January after DC 1707 Executive Director Raglan George
alleged that she had held her office in violation of the union
constitution. The removal of Stokely--who is co-chair of
New York City Labor Against the War, and was an
organizer for last summer's Million Worker March--follows
George's decision to fire two other officials aligned with
her, Gloria Jackson and Chuck Mohan.

Stokely, Jackson and Mohan had been part of a reform slate
with George that won office in May 2002.

Stokely's political views--including her criticisms of the
Democratic Party, speaking as a leader of the Labor Party--
have long been unpopular with the AFSCME hierarchy, as
is her advocacy of union democracy. Zionists within
AFSCME locals have also criticized her pro-Palestinian and
antiwar views.

It appears that the AFSCME leadership's longstanding
hostility toward Stokely dovetailed with the opposition of
her Zionist critics, as well as George's ambition to
consolidate his grip on DC 1707.

At the heart of the controversy is a concessions contract for
day care workers pushed by George and opposed by
Stokely, Jackson and Mohan.

DC 1707, which represents 23,000 day care and home care
workers at centers run by private, nonprofit agencies, is far
smaller than AFSCME DC 37, which represents more than
100,000 city workers. But DC 1707 upstaged its bigger
counterpart by <u>organizing a one-day strike of day care
workers in February 2003, and a three-day strike in June
2004, in the fight for a new contract.</u>

Nevertheless, the new contract put together this month has
<u>many weaknesses. It calls for separate, but simultaneous
raises totaling 12 percent effective January 1, 2005 in a 63-</u>

GOVERNMENT
EXHIBIT
D

*[handwritten:] If you strike
we will replace
you !!!*

*[handwritten:] Average of 2% a year
but ----*

*[handwritten:] City day care workers didn't get any increase for
past six years*

Case 1:11-cv-01850-TPG   Document 1-6   Filed 03/17/11   Page 25 of 40
The struggle for DC 1707
Page 2 of 3

*how terrible for new stuff?*

month contract retroactive to January 1, 2001. Another 2 percent wage increase is set for April 2005--but only if the union agrees to further concessions on productivity. New hires would be paid 11 percent less than the final wage rate as of April.

The contract also lacks any guarantees of retroactive pay for the period since 2001. Instead, the union is relying on Democrats in the state legislature to provide $20 million for such pay at a later date, "a policy that's already failed twice," according to Stokely--once under former Mayor Rudolph Giuliani and again under the current mayor, Michael Bloomberg. The result, said Stokely, will be no compensation for a four-year wage freeze.

*is that you are looking for? If Mayor want to freeze a four-year wage, why Joanna should not?*

*Do you want our school close because of 11 percent less than the final wage rate and a four-year wage freeze?*

Meanwhile, day care centers are closing because low pay means they can't retain the ratio of qualified teachers for the kids. "Our day care centers were the first to be organized in the country," Stokely told *Socialist Worker*. "This came out of the African American struggle as a demand. That's one of the reasons we are raising this up" in the union and the community.

With new union elections coming up in May, George was acting to "clear the decks" of potential rivals--and critics of the concessionary contract put before the membership, Stokely said.

*your union due will go to those people. $500 a year from your pay check equal 2% decrease from your salary.*

To silence her, George used his powers as executive director--an administrative position in the AFSCME structure that allows officials to remain in office for years. George got the DC 1707 delegates to vote to increase his pay from $70,000 to $100,000--and used patronage to get the votes to remove Stokely, she said.

George claimed that Stokely is a union employee, and is therefore ineligible to hold the presidency under union rules. In fact, Stokely had been given a stipend from the union after being laid off from her job in 2003--and in any case cannot be removed without facing charges.

On February 14, Stokely, Jackson and Mohan filed a federal lawsuit to try to overturn George's actions in removing them under the Labor Management Reporting and Disclosure Act.

*In a word, you have a lot to lose !!*

The following day, according to Stokely, George intervened in a contract ratification meeting of AFSCME Local 205, which represents about 7,000 day care workers. Witnesses say that George took over the meeting from Local 205 President Glen Huff to call for a stand-up vote on the contract--violating union procedure that calls for a formal ballot.

Stokely and her supporters vow to continue the fight. "I am a delegate of Local 215, and I will be at the next meeting," she said.

## QUESTIONS AND ANSWERS ABOUT THE UNION

In our discussions with employees about the Union election, several questions have come up that we thought we should share with everyone:

**Q.    I signed a card for the union. Do I have to vote for them in the election?**

A.    No. Even if you signed a card for the union, you have the right and the obligation to vote for what you think is in your best interests. If you do not want to pay union dues or worry about union strikes, you have the right to vote **NO for NO UNION**. Remember, this is a secret ballot election and no one will know how you voted.

**Q.    How much are union dues?**

A.    It is our understanding that union dues range from $23.50 to $41.20 per month. Almost all union contracts require that union dues be taken of your paycheck and sent directly to the union. Almost all union contracts require that all employees in the bargaining unit pay dues regardless of whether or not you like what has been negotiated in the contract. Right now, you do not have to pay dues to receive your current wage and benefit package which exceeds what is offered by all of our competitors.

**Q.    What do I get for my union dues?**

A.    According to the Union's most recent financial statement, it received last year $11,651,459 in revenue. Of that amount, the Union spent **ZERO** on behalf of individual members.

**Q.    What did the Union do with the money?**

A.    Most of the money goes to pay for the Union's expenses and overhead such as the salaries of Union officials. They spent $313,863 for political activities and lobbying and $65,184 for contributions, gifts and grants. Their expenses included over $5,000 for flowers, over



those who actually vote. You can be sure that the Union supporters will show up to vote. If you don't vote, that would mean the election would be decided by only those who want the Union. If you have any doubts about bringing the Union back, you should vote NO for NO UNION.

The election is August 2 between 1:00 and 3:00 p.m. in the gym. Please make sure that you vote.

**VOTE NO FOR NO UNION DUES**

**VOTE NO FOR NO UNION STRIKES**

**VOTE NO FOR NO UNION**

# A LOT TO LOSE

The Union simplified:

**Become union→ make demands→try to negotiate→ we reject demands → strike→ we permanently replace you**

### Employers ultimately decide the terms of the contract, not the Union

In our conversations with staff about the upcoming union election, it has become clear that many teachers are under the impression that they have nothing to lose by joining a union. Obviously, if employees had nothing to lose by bringing in unions, everyone would want to join a union. But only 7% of the country's private sector workers are unionized! Why don't the other 93% want a union? Perhaps they understand what they could lose:

1. **Union Dues**: Union dues range from $23.50 to $41.20 per month. When you have a union contract, you have to pay dues regardless of what the contract says even if there is no improvement in your wages and benefits. In fact, you would have to pay dues even if you end up with a package that is less than what you already have.

2. **Existing Benefits**: The Union can make all the promises it wants. But that does not mean they will become reality. There is no guarantee that in a union contract that you will end up with a better package. There is no guarantee that you will keep everything you have now. It is possible as a result of negotiations you could wind up losing benefits that you already have. We have voluntarily provided you with a benefit package that exceeds what our competitors offer without you having to pay union dues.

### Employers ultimately decide the terms of the contract, not the Union.

3. **Union Strikes:** Right now you have the ability to work without having to worry about having to go out on strike. Preschool of America is not a government agency. We are a private company. This is not like the Department of Education. We can't raise taxes if we do not have enough revenue to meet our expenses .



**We cannot and will not** agree to unreasonable wage and benefit demands that would put us in a noncompetitive position. If the Union was to win the election and we could not come to an agreement, the Union's only weapon would be to <u>call a strike</u>.

- During a strike, <u>you will not be paid.</u>
- During a strike, <u>you willl not collect unemployment</u> unless the strike lasted more than six weeks. Have you thought about how you would support yourself or your family without any money for 6 weeks?
- <u>Finally, if there were a strike, we have the right to **permanently replace you.**</u>

That would mean that you might not have a job when the strike was over. We would not want a strike, but we would prefer that to agreeing to unreasonable union demands. And we would be in a position to <u>hire permanent replacements</u>. Every day we get unsolicited resumes from people who are *anxious* to work for us and who have excellent credentials.

### Employers ultimately decide the terms of the contract, not the Union.

So you see, there can be serious consequences for everyone on staff as a result of unionization. These potential consequences will affect everyone here. Even if you signed a card for the Union, <u>you have no obligation or duty to join.</u> You have the right to decide for yourself after learning all the facts what is best for you and your family.

This is a secret ballot election conducted by the federal government. No one will ever know how you voted.

You can still protect yourself from the risk of the serious consequences by voting **NO for NO UNION.** That is the only way you can be sure that you won't have to pay union dues, possibly lose existing benefits in negotiations, or risk your job security by going out on strike and being permanently replaced.

# Vote NO for NO UNION

7/30/10

## Initial Union Member Starting Fees: more than $1,340

First payment     $200,

First strike fee     $100

Second strike fee $1,040

**Total**            **$1,340**

Plus union due       $40 (monthly)



# <u>Union</u>    VS    <u>Non Union</u>

| | | |
|---|---|---|
| **Salary** | Increase 2% of salary with **a four-year wage freeze** (ACS current union contract) | POA **increase 2% of salary, guaranteed** every year especially in the economic depression (Existing) |
| **Beginning Salary** | 11 % less than original rate ( ACS current union contract) | Higher than other child care centers **based on staff qualifications** |
| **Improved Credentials** | With a strict 5 years contract, union member cannot improve status with education. **No raise, no promotion** when teacher is working on their credits/license. Teacher can only can be the teacher, and the assistant can only can be the assistant | **Professional growth**: We promote staff based on the completion of qualifications. The assistant can be promoted to a teacher; the teacher can be promoted to director. **More qualifications = higher position with more pay** |
| **Qualifications** | **Very strict qualification requirements** with credentials and licenses ( review ACS teacher/assistant requirement with the union contract) | *Flexible schedule to support student teaching and schooling *Free college credits *Staff development *More Ed. credits = more pay |
| **Health Plan** | The labor law only requires a **private company** employer to pay **$100** for share co-payment. | We are currently contributing $300 monthly for each employee who requires the health benefits (Existing) |
| **Retirement Plan** | **Not required** for a private Co. | We offer 401K plan with 3% match |
| **Vacation** | 8 Federal Holidays, **not required more days off for a private Co.** | 11 holidays, 12 sick/personal days and 2 weeks' vacation. Same as ACS |
| **Rules** | Many **restrictions** with schedule and other policies | More **flexibility** in the private company (Existing) |
| **Employee Child Care** | **No other** unionized day care provides employee child care | Yes (Existing) |
| **Relationships & Social effects** | **Hostile**, disruption (court battles, strike, replacement) | Big family oriented, friendship, and **harmony** |
| **Union Dues** | $500 per yr = -2% of your salary. | None |
| **Use of Dues** | *Increase union officials salary *Union salesperson commissions *Political activities and lobbying *Restaurant and hotels, gifts etc. | N/A |
| **Performance** | More unionized day care closing, more day care workers **layoffs** | POA is expanding, more job opportunities |
| **Management** | With union **bureaucracy** and policy, 16 unionized day care centers were closed in 2009 | **Efficient, direct and improving** |
| **Trend** | Union is **declining nationwide**, only 7% companies are unionized, they are all government agencies | More employee involvement, more improvement |

DC 1707 is not UFT (United Federation of Teachers), POA is a private company, all benefits are only from the employer, not union. Compare to the unionized day care centers or the private companies, we have offered a lot.

### Vote for NO UNION!!!!!

GOVERNMENT EXHIBIT

H

EMPLOYEE QUESTIONS ABOUT
UNION.

1) If teacher's win the election are they automatically considered a union?
If the Union wins, they are considered the Union and we will
have to sit down for negotiations.  Unless the Union commits some type of unfair
labor practice at the election (electioneering at the polls, which is highly
unlikely), which then would cause us to file unfair labor practice charges,
we would have to negotiate with them.

2) How much later do the negotiations take place?
The first negotiation session would most likely take place
within a month or so.

3) How long can negotiations take place?
 Negotiations can take an extremely long time.  We are not
required to agree with anything they propose, but must negotiate "in good
faith"  Sometimes negotiations can take more than a year and sometimes do
not result in a contract.

4) Are the teachers a union or is Preschool of America a union?
The Union is District 1707.  It means that the teacher
assistants would have the Union represent them in contract negotiations.

5) If teachers are unionized how long is the contract?
The contract term can be for as long or short as both sides
agree.  Most Union contracts are for 3 years( but only if both parties agree
to that term).

6) If teachers have a contract for a time period and they want to quit before that time can
    they?
The people can quit now even without a Union.  If your present
contract calls for a penalty, fine etc, it may be enforceable.  If we want
to have the teacher assistant be penalized for quitting before the end of
the school year, we can propose that to the Union.  The Company is allowed
and certainly should make proposals if the Union wins.

7)  If teachers quit can they work at another company that is not unionized? Do they still
    have to pay union fees even if they work at a new company if they are still under
    contract?
If they quit, they can work at another non-Union company.
They will not have to pay union dues if they are no longer employed by
Preschool of America.



GOVERNMENT
EXHIBIT
I

8) What happens if teachers do not to pay their union dues?
   Unions do not allow employees to continue to work for a company
   without paying union dues. Most union contracts say that if they don't pay
   Union dues, they will have to be fired.

9) Can they opt out of the union mid contract? If not how do they opt out after the
   contract is over?
   No one can opt out of the contract before the Union contract
   expires.

10) What if all of the unionized teachers decide to leave the school, will the school still be
    unionized?
    If all the assistants leave at the same time, Preschool would
    still be Unionized if it is during the contract or during the first year of
    contract negotiations.

11) What if the school is unionized and we need to hire new assistants. Must those
    assistant become part of the union? If they must become part of the union and the
    contract is half up do they only need to live out the rest of the existing contract?
    If there is a Union, all new workers will be required to join
    the Union. All workers who are in the Union will have to live up to the
    contract until it expires. The Company would have to live up to the
    contract until expiration as well.

12) If teachers strike and we decide to permanently replace them. What are the
    repercussions for Preschool of America?
       If there is a Union, all new workers will be required to join
       the Union. All workers who are in the Union will have to live up to the
       contract until it expires. The Company would have to live up to the
       contract until expiration as well.

# PRESCHOOL of AMERICA

August 3, 2010

Annual Evaluations

We will be conducting teacher and teacher assistant annual evaluations. Everyone is evaluated base on performance, attendance and general conduct. Please be aware that your attendance is <u>critical</u> in our center. Absences, lateness's, and partial day attendance is a significant factor and will contribute to your overall rating.

Thank You,

Robin Mauro



# PRESCHOOL of AMERICA

The children's safety is our # 1 priority. Regular and dependable staff attendance in mandatory.

- More than 1 absence per month will be grounds for immediate termination.

- More than 2 lateness (of more than 5 minutes), per month will be grounds for immediate termination. (Your agreement requires you to be here 5 minutes prior)

- No cell phones used in classroom. Using a cell phone in the classroom will be grounds for immediate termination. ( All parents should communicate with the school through the office only).

- Head Teacher must have cell phones with them at the park or on walks.

Very truly yours,

Joanna Fan
Chief Executive Director



GOVERNMENT EXHIBIT

Sunday, August 22, 2010 **33**

"ough

# 8 at day care gain a union, then lose jobs

W

CNL



GOVERNMENT
EXHIBIT

# PRESCHOOL of AMERICA

Friday, September 3, 2010

Dear Valued Preschool of America Staff,

I would like to take this opportunity to explain any confusion or discontent you have experienced recently. I am disappointed in observing a great deal of speculation and frustration amongst our valued employees over the series of events which have recently unfolded at school. Since POA's staff are important to the success of Preschool of America, I want to make sure that you remain happy, comfortable and positive during your association with us.

I think I had explained before, as a result of the deteriorating economy, it appears that parents are in need of expanded day care services because they often work longer hours and on more days. In order to accommodate these additional needs, I have eliminated the winter and spring breaks on the new 2010-2011 school calendar. I have also added an extra hour to the length of our business hours in order to meet family's needs and schedules. I have done this without increasing tuition costs. Parents appear to be very happy about this change. Thus, maintaining student enrollment will ensure teacher employment.

For people hired prior to 2010, our decision for the school to remain open during the winter and spring breaks will not require you to work any additional days or result in a decrease in benefits. To the contrary, you will be entitled to receive the same number of benefit days, generally on dates that our teachers choose, subject only to ensuring that the school remains fully staffed when open. This policy has been embraced by a majority of our centers with the exception of the West End school and Lexington, which have recently become involved with DC1707 (the Union). Unfortunately, it appears that some staff members were and/or are under the mistaken impression that given representation by a union, they would somehow be able to re-install the winter and spring breaks and/or to additional benefits. Such a notion is false, misleading and simply not true.

As a successful day care center executive, I understand the importance of employee benefits. We remain confident and proud that our benefits package is both favorable and superior to other similarly situated preschool centers as it includes medical insurance, a 401K plan, free college for teachers registering for early childhood courses, discounted staff daycare costs for employee's children and up to 34 paid benefit days to staff members who have completed at least two years employment at POA and a minimum 2% yearly salary increase. Because of our excellent benefits, many valued employees have chosen to remain with us over long periods of time. Disgruntled staff from other day care centers routinely apply for positions with POA.



GOVERNMENT EXHIBIT

on POA's well intended desire to maintain its high standards for their own purposes of expanding, and recruiting and increasing union membership.

No matter what has happened at the West End school and the Lexington school, I appreciate that I still have you as POA's dedicated employees and I like the open communication and look forward to personally addressing your needs in the future. I am confident that under new leadership, our schools will flourish and thrive. As preschool of America continues to grow, POA remains committed to continuing its personal, family style working environment and hope that you will want to continue to grow professionally with us.

Truly yours,

Joanna Fan

Chief Executive Director

# 👤🌱 PRESCHOOL of 🦅 AMERICA 🌟

**1501 Lexington Avenue New York, New York 10029 Tel 212.987.3700 Fax 212.987.3344**

Dear Valued Parents of Preschool of America Lexington,

I would like to take this opportunity to apologize for any confusion or discontent you have experienced recently. There has been a lot of speculation and frustration about the series of events that have been unfolding at school at this time and I would like to take this opportunity to explain as much as possible.

As you are probably already aware, we have eliminated the winter and spring breaks on the new 2010-2011 school calendar. We have also added an extra hour to the length of our business hours in order to meet your family's needs and schedules. We have done this without increasing tuition costs. The feedback that we have received from parents is very positive. Although we have eliminated two pre-established vacation times during the school year, we did <u>not</u> eliminate the much-needed vacation times for our teaching staff.

As a successful day care center, we understand the importance of employee benefits. We provide medical insurance, a 401K plan, free college for teachers registering for early childhood courses, discounted staff daycare costs for their children, paid benefit days. Staff members who have made a commitment to work for the company are rewarded for the work that they do at Preschool of America. They are able to receive up to 34 paid benefit days, including 12 holidays, 12 personal/sick days, and two weeks (10 days) of vacation.

In the past when school was closed for winter and spring breaks, all staff members had to take these two weeks of vacation every year. By changing the school calendar to remain open those two weeks, we award the same number of benefit days at times that the teachers are free to choose. This policy has been embraced by a majority of our centers, however the Lexington center is one of two centers that have chosen to take this matter up with DC1707 (the Union). Some staff members were under the impression that with representation of a union, they could demand that winter and spring breaks be reinstated or get more benefits. Thus the petition was filed and a union election will be held in the beginning of September.

On August 22, our employee Ms. Dianna DeLeon made a false statement to Daily News that she had a Bachelor degree making $10 per hour as a teacher. The truth is that she does not have BA degree and she was hired as an assistant. Our teachers are offered $28,000-$45,000 based on their degrees, certification, and experience. She also stated that people were being threatened to be fired if they joined the union, which is obviously as far from the truth as possible. She has misled the media and public on her position, degree and our teacher's salary which caused huge damage to this school. Yesterday,



August 23rd, three men from DC1707 (the Union) were standing outside of our Lexington center handing out an article written in the Daily News with Ms. DeLeon's false statement. I sincerely apologize for the inconvenience and misinformation that has resulted from these incidents, but I am confident that under new leadership, the school will flourish and thrive- and new teachers and assistant teachers will bring a highly professional aspect to our current staff.

As always, we are dedicated to open communication and we look forward to addressing your needs now and in the future. I hope this letter provides a better understanding of the issues we are facing and our sincerest desire to please the most important members of our community: children, families, and staff members.

Warmest Regards,


Joanna Fan
Chief Executive Director