FORM NLRB-5168
(2-08)

City of New York

Case No. 2-CA-39988
2-CA-40056

County of New York

### Confidential Witness Affidavit

I, Jill Howard, being first duly sworn upon my oath, hereby state as follows:

I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding.[1]

My business address is 345 West 42nd Street, NY, NY 10036.
My direct business telephone number is 212-767-0606.

1.   I have been a managing director for Preschool of

America, Inc (POA or Employer) since around August 2009.  When I

started in this position, POA had just created two managing

director positions (myself and Mego Gojka), prior to this POA did

not have managing directors.  Before becoming a managing director

for POA, I was most recently the site director at POA's Chelsea

facility located at 600 6th Avenue (Chelsea) from about August

2006 until around August 2009.  As a managing director my duties

are to oversee the site directors at POA's about 11 preschools

around the city, handle employee benefits and unemployment claims

---

[1] **PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

1

FORM NLRB-5168
(2-08)

1   and benefits and field parent complaints from parents and site

2   directors.

3       2.    After their six month probation, employees of POA are

4   entitled to personal, sick and vacation leave depending on their

5   length of employment.  Their allotted number of days for

6   personal, sick and vacation leave varies based on how long they

7   have worked for POA.  For the first six months an employee is

8   employed, they are on probation and do not have any paid leave.

9   From six months to one year, employees are entitled to 3 days of

10  paid sick/personal leave.  Between one year of employment and two

11  years of employment, employees are entitled to six paid

12  sick/personal leave days.  After two years, employees are

13  entitled to 12 paid sick and personal leave days.  In addition,

14  POA was closed for two weeks a year, one week for spring break

15  and one week for winter break.  In the spring of 2010, POA

16  decided to remain open during winter and spring breaks commencing

17  with the winter break 2010.  Instead, POA decided to give certain

18  employees vacation leave.  The vacation leave policy takes effect

19  September 2010 and is in addition to their sick and personal

20  days, on the schedule that I described above.  In their first

21  year, an employee is not entitled to any vacation leave.  Between

22  year one and year two of their employment, an employee is

23  entitled to five days of vacation and after an employee has been

24  employed for two plus years, an employee is entitled to ten days

25  of vacation.  An employee may only take one paid sick/personal

26  day per month.  Any time off over the one sick/personal day is

27  unpaid.

2

FORM NLRB-5168
(2-08)

1    3.    When I was the site director at Chelsea, employees

2    would request personal leave or planned sick leave (i.e. a

3    surgery) by asking me.  Usually I would tell the employee to look

4    at my calendar.  I maintained a calendar on the wall in my office

5    where I recorded who planned to be absent on any given day.  My

6    policy was that if there were already two people who would be

7    absent on a given day, then no one else could take planned leave.

8    Once the employee looked at my calendar and saw that there were

9    less than 2 employees already out on the day they were requesting

10   off, they would complete a request for leave form.  The employee

11   would give the request for leave form to me and I would sign off

12   on the request for leave form.  I would then place the leave

13   request form and any documentation provided by the employee in

14   their personnel file.  This was the practice regardless of

15   whether or not the day off was a paid day off or not.

16   4.    As the site director at Chelsea, I performed reviews

17   of employees.  The reviews were written by me, and I evaluated

18   the teachers based on my observations, parent feedback, time and

19   attendance records and disciplinary history.  I gave each

20   employee a copy of their written evaluations when I had completed

21   them.  I tried to, but did not always evaluate each teacher and

22   assistant teacher twice a year, approximately once in November

23   and approximately once in April.  I did not always conduct

24   reviews right before contract renewals around August of each year

25   because evaluations are time consuming and there were too many

26   employees to do that.  I knew whose contracts would be renewed

27   based on my experience with the teachers and assistant teachers

3

FORM NLRB-5168
(2-08)

1  throughout the year.  I would place each teacher and assistant
2  teacher's evaluation in their personnel file.

3         5.    Between September 2006 and August 2007, as the site
4  director at Chelsea, I recall that I terminated one employee
5  during the school year.  I recall that I terminated the employee
6  because she used language that was not suitable for children
7  around the children and that she was insubordinate.  I do not
8  recall whether or not she had been disciplined prior to her
9  termination.  Around August 2007, I did not renew approximately
10  three teacher's and assistant teacher's contracts for the 2007-
11  2008 school year.  During the 2007-2008 school year, I recall
12  firing approximately one employee, an assistant teacher.  The
13  assistant teacher was terminated because she called out of work
14  at the last minute frequently and was late a lot.  I recall that
15  she was terminated after receiving verbal and written warnings.
16  She continued to call out of work and appear late, so she was
17  terminated.  I do not recall when she was terminated, but it was
18  during the school year.  Around August 2008, I did not renew the
19  contract of one teacher, a head teacher.  I recall that the head
20  teacher was terminated after receiving verbal and written
21  warnings because of complaints that I received from parents and
22  insubordination.  I do not recall when I terminated her, but it
23  was during the school year.  Around August 2009, while I was
24  still the Chelsea site director, I did not renew one head
25  teacher's, Lena Franklin, contract because she would call out of
26  work last minute too often, and was frequently late.  I recall

4

FORM NLRB-5168
(2-08)

1   that I had issued Lena Franklin written warnings prior to her
2   termination, but I do not recall how many.

3        6.    I recall meetings around October 2009, with the site
4   directors and the other managing director, Mego, where Mego and I
5   handed out standard evaluation forms for the site directors to
6   use.  We instructed the site directors to use the standard
7   evaluation forms.  We did not tell them when to do their
8   evaluations.  It is common practice to place an employee
9   evaluation in their personnel files.  I do not check to make sure
10  that the site directors are performing evaluations or that they
11  are placing the evaluations in employees' personnel files.

12       7.    I am not regularly involved in any site director's
13  review process.  I may become involved if a site director asks
14  for advice.  The site director makes the final personnel
15  decisions, and they do not inform me of their decisions prior to
16  informing the employee.  I do find out after employees are fired
17  or their contracts are not renewed.  If a person is fired or
18  their contract is not renewed, the site director fills out a
19  termination/resignation form and forwards it to myself and Mego.

20       8.    Beginning around late 2009 or early 2010, I recall
21  Catherine Madaio (Madaio), former West End site director,
22  forwarding us e-mails complaining that Tameka Singleton and Hope
23  Dublin were insubordinate, and specifically that Tameka had
24  yelled at Catherine in her office.  I do not recall Catherine
25  complaining about Tameka Singleton and Hope Dublin's time and
26  attendance.  She made these complaints on several occasions.  I
27  do not recall what my advice to her was, but I think I told

FORM NLRB-5168
(2-08)

1   Catherine to document the incidents and that if it continued to

2   terminate them.  Catherine's last day was around June 3 or 4,

3   2010. I relayed these complaints to Robin around June 7th JH.

4       9.   I interviewed Robin about three times.  We were

5   letting Catherine because of her mismanagement of the West End

6   facility.  During the course of the interview process, I told

7   Robin that the parents were complaining that there were

8   inconsistencies in teachers at the facility because the staff was

9   always out.  I said that there were issues with communication

10  between the school and the parents because Catherine was not

11  effectively communicating with the parents.  I told Robin that

12  Catherine was not following up on teachers' or parents' concerns.

13  I told Robin that Catherine did not know the policies well and

14  did not enforce them well, amongst the staff and the parents.

15      10.   When Robin started on or around June 7, 2010, I worked

16  with her at West End to train her in her new position, and I knew

17  the parents of the West End children and the teachers, so I

18  thought it would make the process easier.  I worked at West End

19  with Robin for approximately two weeks, until around June 18,

20  2010.  Robin had previously trained at 42nd Street, and she had

21  been given the forms and the DOH rules that governs preschools.

22  I stayed in the office, answering the telephones while she went

23  around and observed the teachers and assistant teachers.  I

24  recall that around June 7, 2010, Samantha Giordana Grerena

25  (Samantha) came to me and told me that Catherine had cut her

26  hours.  I asked Samantha why Catherine had cut her hours.

27  Samantha said that it was because she was late a lot and she was

FORM NLRB-5168
(2-08)

1   out a lot.  I told Samantha that we could probably get her more
2   hours, if she improved her attendance.  I told Robin that she
3   should give Samantha a second chance and see if Samantha could
4   improve her attendance.  I think, but I am not sure, that soon
5   thereafter, Robin gave Samantha more hours because we needed
6   coverage.  In addition, Robin began to look through everyone's
7   personnel files.  I saw Robin looking through the cabinet where
8   the personnel files are kept, and I saw her with open personnel
9   files, but I did not look at the files and I did not see whose
10  files she was reviewing.  I had previously told Robin that
11  Catherine had had issues with Tameka Singleton and Hope Dublin.
12  At some point, Robin came to me and said that Reina Peralta's
13  classroom was unorganized and that Robin did not like Reina's
14  interactions with the children.  During the two weeks that I was
15  present at West End, I witnessed Reina Peralta yelling at the
16  children several times.  I also recall that Robin said that while
17  she was looking through Anesia Lloyd's (Anesia) personnel file,
18  that Anesia wasn't qualified to be a head teacher.  I said that
19  if she wanted to keep her head teacher status, she would need to
20  take a class.  At a later date, but I do not remember when, Robin
21  told me that Anesia was not interested in taking a class and
22  Anesia was being changed to an assistant teacher position.
23  Between June 7 and June 10, 2010, I recall Robin telling me that
24  in her experience in those two weeks working at West End, and
25  after reviewing the personnel files, that Robin wanted to get rid
26  of about half of the staff.  I said that it was her school now

7

FORM NLRB-5168
(2-08)

1  and she could do what she wanted. I do not recall saying

2  anything else in this conversation.

3       11. I recall several conversations with Robin between June

4  7, 2010, and until around August 2010. I do not recall the

5  specific conversations, but I remember that she would complain

6  that she did not have enough teachers or assistant teachers due

7  to latenesses and absences of the teachers at her facility, and

8  she would ask me for resumes. She did not say whether she wanted

9  the resumes to hire new teachers or to hire substitute teachers.

10  I believe that there were a few people hired over the summer, but

11  I do not know how many and when they were hired, and that certain

12  staff members from another POA facility worked at West End for

13  some period of time. I recall at least one conversation where

14  Robin complained that Samantha was calling out a lot. In this

15  conversation, I told Robin then Robin should let Samantha go. I

16  recall another conversation with Robin where Robin was

17  complaining that Samantha was telling Robin how to do something,

18  and that Robin did not like Samantha's tone with Robin. I said

19  that if she was out a lot and had these issues with Samantha,

20  then Robin should let her go. I do not recall Robin talking

21  about any other specific employees or any other types of work

22  performance issues relating to the employees between June and

23  September 2010.

24       12. On or around July 27, 2010, a meeting was held at West

25  End with me, Mego and Robin with about fifteen assistant

26  teachers. When the meeting started, either me, Mego or Robin

27  handed the assistant teachers a handout titled "union versus non-

FORM NLRB-5168
(2-08)

1   union." I said that we wanted to make sure that the employees

2   were fully informed before they make a decision on how to vote,

3   and that we wanted to go over some pros and cons about union

4   membership. I said that if they had any questions, ask them

5   while we were talking. Robin began to read through the union

6   versus non-union handout. I do not remember Robin saying

7   anything other than reading off of the handout. When Robin got

8   to the improved credential section, I said that I was hired as a

9   teacher and then I was promoted to director and then promoted to

10  managing director. When Robin got to the health plan section, I

11  remember saying that my husband has health insurance and he still

12  pays $500 a month for his health insurance. I recall that one of

13  the assistant teachers said that she did not know what to do with

14  her children during the winter break, if they have to work. I

15  asked how old the child was, and suggested that if they were the

16  right age, we could see if we could find coverage for those

17  children in one of the schools. I remember Mego speaking during

18  the meeting, but I do remember what she said. I recall that the

19  assistant teachers had questions about the union that we did not

20  know the answers to. I wrote the questions down. I do not

21  recall what the questions were. I recall one employee saying

22  that Robin told her that Robin would replace her. I recall Robin

23  saying that she never said that. I said that maybe the employee

24  misunderstood Robin. The employee said that she did not

25  misunderstand Robin. Robin said that she definitely did not say

26  that and that the employee must have misunderstood. Robin was

27  just telling the employee the basic steps of what happened with a

9

FORM NLRB-5168
(2-08)

1   union strike, but the employee missed the entire middle part of

2   the conversation.  Robin did not say what she was referring to,

3   but it sounded like the information we were scripted so I though

4   that Robin had been talking about the fact that we would have to

5   replace employees if they went on strike.  That is all that I

6   recall from the meeting.  The meeting lasted about an hour.  I

7   left the meeting before it ended.  I e-mailed the employees'

8   questions to POA's lawyer.

9       13.  I was not involved in any of Robin's evaluations of

10  the West End teachers or assistant teachers.  I talked to Robin

11  during her evaluation process, and I remember Robin saying can

12  you believe that this person took over x number of days over

13  their allotted time.  I recall that Robin was not calling me for

14  advice, but we speak often and we were just chatting and these

15  things would come up.  I do not recall Robin saying anything

16  specific about individual employees in August 2010.  Robin did

17  not inform me of which teachers and assistant teachers that she

18  was renewing for the 2010-2011 school year.  I found out which

19  teachers Robin did not renew when I received a

20  termination/resignation form for each person and I had a

21  subsequent conversation with Robin where she told me who she had

22  not renewed.  I do not recall anything else from the conversation

23  and I don't recall Robin saying anything specific about any

24  specific employee.

25      14.  On or around August 25, 2010, I was at the POA

26  facility at 1501 Lexington Avenue (LEX) because Gina Cavitolo

27  (Gina), site director, or Gail Wells (Gail), site director has

FORM NLRB-5168
(2-08)

1  asked me to be present when they informed Reina Peralta that she

2  was being asked to leave a few days before her resignation date.

3  About a week before August 25, 2010, a parent called me and asked

4  me if it was true that there were several unlicensed teachers

5  teaching at LEX. In the conversation he told me that his child

6  was in Reina Peralta's class. He did not tell me who told him

7  this information, but I surmise that it was Reina Peralta because

8  she had resigned and his child was in her class. I told him that

9  we followed the laws at our schools and that I would follow up

10  and do some investigation. I hung up with the parent and called

11  Gina told Gina that Reina was causing problems in her class by

12  divulging confidential information, or information that is not

13  true. Gina then said that Reina Peralta was constantly on her

14  cell phone in her classroom and said that she was causing other

15  problems, but did not say what they were. I do not recall if I

16  suggested it, but it was decided by me, Gail and/or Gina that we

17  would let Reina Peralta go a few days before her resignation

18  date.

19      15.  Gail was terminated on or around September 14, 2010,

20  because her communication skills with parents were not good based

21  on her letters to parents and her conversations with parents. I

22  recall that her letters were short and pithy and were not

23  empathetic. I had discussed this with her on several occasions,

24  and I had given her samples to improve her communication skills.

25  I did not issue Gail a written warning about this. Gail no

26  longer works for POA.

11

FORM NLRB-5168
(2-08)

1     16.  During the month of July 2010, I recall that I handed

2  out union literature at LEX, and went to LEX to give them copies

3  of the new handbook around August 2010, but I did not have any

4  conversations with any employees about a union.  When I handed

5  them the union literature at LEX, I recall telling employees that

6  they could contact me with any questions.  No one contacted me.

7 I am being provided a copy of this Confidential Witness Affidavit
8 for my review. If, after reviewing this affidavit again I
9 remember anything else that is relevant, or desire to make any
10 changes, I will immediately notify the Board agent. I understand
11 that this affidavit is a confidential law enforcement record and
12 should not be shown to any person other than my attorney or other
13 person representing me in this proceeding.

15 I have read this statement consisting of 12 pages, including this
16 page.  I fully understand its contents, and I certify that it is
17 true and correct to the best of my knowledge and belief.

Jill Howard

20 Sworn to before me at
21 26 Federal Plaza, Room 3614
22 New York, New York this
23 30ᵗʰ day of September 2010

27 Nicole Buffalano, Board Agent,
28 National Labor Relations Board

12