FORM NLRB-5168
(2-08)

City of New York

Case No. 2-CA-39988
2-CA-40056

County of New York

**Confidential Witness Affidavit**

I, Mego Gojka, being first duly sworn upon my oath, hereby state as follows:

I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding.[1]

My business address is 345 West 42nd Street, NY, NY 10036.
My direct business telephone number is 212-767-0606.

1.  I have been a managing director for Preschool of America, Inc (POA or Employer) since around August 2009. When I started in this position, POA had just created two managing director positions (myself and Jill Howard), prior to this POA did not have managing directors. Before becoming a managing director for POA, I was the site director for POA's facility located at 101 West End (West End or WE) from about January 2007 until around August 2009. As a managing director my duties are to oversee POA's eleven or twelve preschools around the city, receive phone calls from parents regarding complaints with staff and facilities, receive questions from the site directors and

---

[1] **PRIVACY ACT STATEMENT**
Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or

FORM NLRB-5168
(2-08)

1 provide answers to their questions and schedule trainings for the
2 teachers at the sites.

3     2.   While I was the site director, Faye (lnu), was the
4 bookkeeper at WE.  During the time that I was the site director,
5 after a six month probation, and after 2 years of employment with
6 POA, from the date of hire, teachers and assistant teachers are
7 entitled to 12 days of sick/personal/vacation leave.  I do not
8 know how much leave teachers and assistant teachers are entitled
9 to prior to their two year anniversaries.  Around April 2010, POA
10 decided to keep POA open during our spring and winter breaks due
11 to parent complaints.  At this time, POA changed our
12 sick/leave/personal leave policy.  This new policy, effective
13 September 2010, will add 10 days of vacation leave for all
14 employees, who had been employed while POA had winter and spring
15 breaks in addition to the number of sick/personal days they are
16 entitled to under their contract.  The new hires do not receive
17 10 days of vacation policy does not apply to new hires.  The
18 number of sick and personal days that the employees were entitled
19 to before this change in vacation leave policy remained the same.
20 The sick/personal days that employees receive they are only paid
21 for one sick/personal day a month.  If an employee is sick for
22 more than one day, they are not paid for the days they took off
23 over the one day in a month.

24     3.   When I was the director at West End, I followed this
25 rule closely.  When I was the site director, when an employee
26 requested leave, they would [usually full] complete a leave request form and

representation case, or may cause the NLRB to issue you a subpoena and

FORM NLRB-5168
(2-08)

1  submit it to me.  If there was an emergency or an employee needed
2  to be out of work at the last minute, they would call me or email
3  me and let me know so that I could arrange a substitute.  Faye
4  was not involved with employee leave requests or approving
5  employee leave.  When I was the director at West End, I also
6  implemented a progressive discipline policy.  I would first
7  verbally warn the employee, then give them between one and three
8  written warnings, depending on the severity of their conduct and
9  then I would meet with the employee to decide whether to
10 terminate the employee or to place them on probation.  I did not
11 like to terminate an employee mid-school year because it disrupts
12 the classroom, but it did happen on two occasions that I can
13 remember.  My policy on latenesses was that I would usually give
14 an employee a written warning after they were five to ten minutes
15 late three times in any one year period of time.  With respect to
16 absences, I considered the number of absences when performing
17 yearly reviews of employees.  Generally, if an employee took more
18 than three days off in one month, I would sit them down and
19 explain to them the importance of being present at the facility
20 and tell them that they needed to stop taking so many days off.
21 When I was a site director, there were about 30 teachers and
22 assistant teachers working at West End.  In the first year that I
23 was site director, between January 2007 and September 2007, I
24 issued about 15 written warnings to teachers and assistant teachers mlh for taking too many
25 absences and/or excessive latenesses.  I did not fire anyone
26 prior to August 2008, when I decided not to renew the contracts

seek enforcement of the subpoena in federal court.

3

mlh

FORM NLRB-5168
(2-08)

of about 7 teachers and assistant teachers because of time and attendance issues. I do not recall whether or not all of those seven employees had been written up for time and attendance issues prior to my decision not to renew their employment contracts around August 2007, but I do recall that I had issued some of them written warnings. On or around August 2008, I did not renew the employment contracts of about 4-5 teachers and assistant teachers, out of about 30, at West End. I did not decide which teachers and assistant teachers would have their contracts renewed for the 2009-2010 school year because I left in August of 2009. For each employee whose contract that I did not renew, I would rely upon written warnings, a negative yearly review and/or attendance records. I did all employee evaluations in writing. While I was the site director, there was no site director handbook. I heard from other site directors that I needed to perform yearly reviews. I created my own system for reviewing employees which included ongoing observation of teachers and assistant teacher, based on attendance, punctuality, professionalism (not gossiping, dress code), classroom management, parent communication and communication within the facility. I performed my yearly reviews around July and August of each year. At that time I would decide whose contracts would be renewed. This message was not relayed to the teachers and assistant teachers until around the end of August.

4. Beginning around late 2009, POA implemented a new bi-yearly review process. We informed all POA site directors of this policy at site director meetings which Jill and I conducted

4

FORM NLRB-5168
(2-08)

1  around late 2009.  At the meetings, we told the site directors
2  they needed to perform bi-yearly reviews of all teachers and
3  assistant teachers. Some of the site directors were concerned
4  that they did not have enough time to perform two reviews for
5  each teacher and assistant teacher in the year.  Jill and I told
6  the site directors that they needed to perform at least one
7  written yearly review for each teacher and assistant teacher.  At
8  this meeting, we told the site directors that yearly reviews
9  needed to be done in writing and provided all site directors with
10 yearly review forms to be completed by the site directors for
11 each teacher and assistant teacher.  The forms we provided were
12 an evaluation form, where the site director would rate the
13 teacher or assistant teacher in different categories, including
14 attendance, punctuality, professionalism (not gossiping, dress
15 code), classroom management, parent communication and
16 communication within the facility, and make notes regarding how
17 each teacher and assistant teacher performed in that category.
18      5.    Each site director independently determines which
19 employees' contracts that they will renew after performing their
20 teacher and assistant teacher evaluations.  The site directors
21 are not required to contact me and inform me of their decisions
22 prior to making the decision.  I [My] will learn of the site
23 director's decision if they contact me.  The site directors'
24 decisions are not reviewed by me or Jill, unless the site
25 director has questions.
26      6.    I was on maternity leave from around May 2010 and
27 returned to work on August 18, 2010.  When I returned from work,

5

*My*

FORM NLRB-5168
(2-08)

1  I acted as the site director at West End for August 18, 19 and
2  20, 2010, because Robin Mauro (Robin) was on vacation that week.
3      7.   On or around August 19, 2010, around 4:30 p.m., I was
4  preparing to leave for the day and I noticed that Hope Dublin
5  (Hope Dublin or Hope), Tameka Singleton, Joan DeLeon, Tatiana
6  Navia, and Julian DeJesus (Julian), Union representative,
7  standing in the park across the street from West End.  As I was
8  leaving for the day, I walked across the street to the park and
9  approached Hope Dublin.  The others were standing close by, but I
10 was speaking to Hope Dublin.  I asked Hope what was going on and
11 Hope said that they lost their jobs and they are their
12 protesting, fighting to get their jobs back.  I said oh, okay and
13 I walked back.  Hope and I continued a conversation about my baby
14 for about a minute.  At some point while I was talking to Hope,
15 Julian introduced himself to me and said that he had heard good
16 things about me.  I said oh okay and I walked back into the West
17 End facility.  I spoke to Hope for a minute or two.  I spoke to
18 Julian for less than a minute. I was across the street in the
19 park for about two minutes in total.
20     8.   I was not involved in any way with Robin's yearly
21 evaluations of the teachers and assistant teachers at West End in
22 2010.  I was not involved in Robin's decisions of which teachers
23 and assistant teacher contracts that she was going to renew for
24 the 2010-2011 school year, nor was I involved in the process of
25 her making those decisions.  I was not involved in any way with
26 Gail Wells (Gail) or Gina's (lnu) (Gina) yearly evaluations of
27 the teachers and assistant teachers at the POA facility located

MG

FORM NLRB-5168
(2-08)

1  at 1501 Lexington Avenue (LEX). I was not involved in Gail or
2  Gina's decisions of which teachers and assistant teacher
3  contracts that they was going to renew for the 2010-2011 school
4  year, nor was I involved in the process of their making those
5  decisions. I do not know who at LEX made the decisions of which
6  teachers and assistant teachers contract to renew.
7      9.   On or around June 18, 2010, Joanna called me and asked
8  me if I knew anything about a union at West End. I said that I
9  did not know anything. On or around the week of July 19, 2010, I
10 received a phone call from Joanna who said that there would be a
11 meeting at West End to review a Union versus Non-Union document
12 to make sure the staff knew exactly what they would be signing up
13 for. The meeting was scheduled for July 27, 2010, around 1 p.m.,
14 at West End for their assistant teachers. On July 27, 2010,
15 around 10 a.m., I went to West End and met with Robin and Jill in
16 the office and we discussed the meeting that we would hold that
17 day. Around 1 p.m., Jill, Robin and I went to the gym for the
18 meeting. There were about 13 assistants present, including Hope,
19 Tameka Singleton, Antonette Monroe, Anna Catsnelson, Joan DeLeon,
20 Anesia Lloyd, Tatiana Navia, Maria Estervena Torres, Catherine
21 Duran, Amanda Nunes and Tatiana Gibbs. Jill said that we were
22 there in the meeting to educate the employees on having a union
23 versus not having a union. Jill said that there was a vote on
24 August 2, 2010, that we wouldn't know how the employees would
25 vote, and that we were just holding this meeting to educate the
26 employees. I said that it was important to know about the union.
27 I told the employees that they needed to do their homework, I

1 said that unions have benefits but also have drawbacks. I also
2 said that I was happy to see everyone, that I wished that I was
3 there under better circumstances, but that I was here to be of
4 support and answer any questions that I could. Robin read
5 through the Union versus non-Union handout, reading it to the
6 group as she went along. I do not recall if we handed out copies
7 of the union versus non-union handout at this meeting, but each
8 of the assistant teachers were holding a copy of it. When Robin
9 got to the section of the handout regarding the relationship of
10 management to employee with and without a union, I said that we
11 hoped to gain the family like environment that we once had. I
12 also explained our policy with respect to vacation leave and our
13 remaining open during the spring and winter breaks. While Robin
14 was reading from the Union versus non-Union handout, Catherine
15 Duran (Catherine) said to Robin that Robin had told her that
16 Robin had showed her teacher resumes and told Catherine that she
17 could be easily replaced. Robin said that she did not mean that
18 she could replace Catherine, that there was a miscommunication
19 and that she did not mean that. I do not recall if Robin said
20 anything else. Hope, and several other assistant teachers, but I
21 do not remember who asked how the vacation leave would operate
22 now that we no longer had a winter and a spring break. One of
23 the assistant teachers asked if she would always be a union
24 member at any job she held if the employees voted for a union at
25 West End. Robin said that she did not know the answer to that
26 question. Jill took notes of the employees' questions that we
27 could not answer and sent them to Joanna via e-mail. At the end

FORM NLRB-5168
(2-08)

1  of the meeting, Jill had to leave the meeting early and Robin was
2  called out of the meeting, and it was just me and the assistant
3  teachers in the meeting. I asked the assistant teachers how they
4  liked the new director. The assistant teachers said that Robin
5  was a stickler with policies. I said that she had her
6  responsibilities to fulfill for POA. I remember that they said
7  that Robin did not allow teachers to celebrate birthdays. When I
8  was there we did special things for people's birthdays. The
9  assistant teachers said that Robin did not allow them to sing
10 happy birthday or eat cake in their classrooms. I said that I
11 would follow up with Robin. I recall that the assistant teachers
12 said that when they take their children outside, they had to have
13 a head teacher with them, even if there were two assistant
14 teachers with them. They felt belittled because of this policy.
15 I told them that Robin was right because there were State rules
16 that each classroom must have a qualified teacher in it, so a
17 head teacher had to be with them at all times. I said that it is
18 so important when they go outside to have a teacher, not just
19 because of State rules, but because things can happen and the
20 head teachers know exactly what to do in the event of emergency.
21 We talked about my baby for a few minutes, how old she was, and I
22 showed them pictures. I spoke to the assistant teachers alone
23 for about 30 minutes. That is all that I recall from the
24 meeting. The meeting ended. The meeting lasted about an hour.
25      10.  I did not have any conversations with the site
26 directors at LEX or West End about any of the teachers whose

FORM NLRB-5168
(2-08)

contracts were not renewed at those facilities for the 2010-2011 school year.

11. Outside of the meeting at West End on July 27, 2010, I did not have any conversations with any of the employees about the union.

I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this affidavit again I remember anything else that is relevant, or desire to make any changes, I will immediately notify the Board agent. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this statement consisting of 10 pages, including this page. I fully understand its contents, and I certify that it is true and correct to the best of my knowledge and belief.

_____
Mego Gojka

Sworn to before me at
26 Federal Plaza, Room 3614
New York, New York this
30th day of September 2010

_____
Nicole Buffalano, Board Agent,
National Labor Relations Board