FORM NLRB-5168
(2-08)

City of New York

Case Nos. 2-CA-39988
2-CA-40056

County of New York

### Confidential Witness Affidavit

I, Gina Cavitolo, being first duly sworn upon my oath, hereby state as follows:

I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding.[1]

My business address is 1501 Lexington Avenue, New York, New York 10029.

My telephone number is 212-987-3700.

I am employed by Preschool of America ("the Employer") as the Site Director for the Employer's facility located at 1501 Lexington Avenue, New York, New York 10029.

   1. I began working for the Employer at its facility at 1501 Lexington Avenue (LEX) on or about August 23, 2010.   Prior to this position, I worked as a head teacher at Employer's facility located on Park Avenue between 93rd and 94th Streets from around 2008 to 2010.

   2. When I started at LEX, I was not told anything about the employees and their work performance issues by Joanna Fan, owner

---

[1] **PRIVACY ACT STATEMENT**
     Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.



FORM NLRB-5168
(2-08)

1  and/or shareholder or Gail Wells (Gail or Gail Wells), site

2  director.  Gail Wells started working at LEX in June 2010, and at

3  the end of her probation on September 14, 2010, she was asked to

4  leave.  Prior to Gail, the site director was Lisa Terzilli.  It

5  is my understand that the decisions regarding whose contracts

6  were not going to be renewed for the 2010-2011 year were made by

7  Gail and Lisa, and I had no input, nor was I consulted on any of

8  those decisions.

9     3. On my first day of work, I was in the office with Gail

10  and Kelly and either Gail or Kelly told me that Evelyn Aguirre

11  and Magaly Linares' contracts were not being renewed for the

12  following year because they had excessive absences and latenesses

13  and that these decisions were made by Lisa Terzilli.  Also on my

14  first day, Kelly Li (Kelly), bookkeeper, told me that Reina

15  Peralta had resigned the week before and had requested that her

16  last day would be September 7, 2010.

17     4. In early August, at a director's meeting, held by Jill

18  Howard, managing director, Jill said that that we should be

19  observing the teachers and assistant teachers and conducting

20  employee evaluations at least once a year.  In the beginning of

21  August 2010, Joanna told me that she was going to conduct a

22  meeting of all of the employees and review a handout titled

23  "union versus non union" as well as review a list of 12 questions

24  about unions.  Soon thereafter, Joanna e-mailed me these

25  documents.  They are attached to this affidavit as Exhibit A and

26  Exhibit B.

2

FORM NLRB-5168
(2-08)

1    5. Prior to August 23, 2010, I was at the LEX facility on

2    two occasions.  The first time that I was at LEX prior to August

3    23, 2010, was in early August 2010, but I do not recall the date.

4    I was at the facility at the request of Joanna to attend two

5    meetings she was holding there.  The first meeting was scheduled

6    for 1 p.m. for all of the assistant teachers, and the second

7    meeting was scheduled for around 1:30 p.m. for all of the head

8    teachers.  I arrived at the facility a few minutes before 1 p.m.

9    and went to the gym where Joanna was holding the meeting.  After

10   I entered the building, I walked into the office and spoke to

11   Kelly for a minute or two.  I knew Kelly previously.  After

12   speaking to Kelly, I walked to the gym without speaking to

13   anyone.  I walked into the gym and the chairs were set up in a

14   circle.  Joanna, Gail, Kelly and myself.  There were also about

15   six assistant teachers present, including Dianna DeLeon, Magaly

16   Linares, Eve Apodaca, Veronica Jean, Clarissa Ribera, and Evelyn

17   Aguirre.  Joanna introduced me as the co-director.  Joanna said

18   that I would be starting work on August 23 and to treat me as the

19   director.  Joanna said that I would be there to help them and

20   assist them.  Joanna told them about her background, that she

21   came here to the United States with nothing; she tried teaching,

22   but decided this was more the field for her.  So she started the

23   preschools.  Joanna said that they should take extra courses and

24   continue to go to college.  Joanna told them that I started as a

25   teacher and worked my way up to site director, and that there

26   were opportunities for growth within the Employer's system.

27   Joanna read the document attached to this affidavit as Exhibit A.

3



FORM NLRB-5168
(2-08)

1   Joanna stopped as she was reading the document and asked if

2   anyone had questions, and no one did.  All I can recall from the

3   meeting is that Joanna read from Exhibit A and Exhibit B.  I do

4   not recall any questions from the assistant teachers, or anyone

5   else speaking besides Joanna.  The 1 p.m. meeting lasted about 30

6   minutes.  I stayed in the gym while the six assistant teachers

7   left.  A few minutes later, about five head teachers entered the

8   gym and sat in the chairs that were set up.  Dianna Riopedere,

9   Reina Peralta, Jenisse Santiago, Zoila Des La Nueces and Lorraine

10  Aguirre.  This meeting was exactly the same as the first one.

11  All I recall from the meeting is that Joanna introduced me to the

12  staff, told her personal background, read from Exhibits A and B,

13  and asked if there were any questions.  I do not recall Joanna

14  saying anything else at the meeting.  I do not recall Kelly or

15  Gail speaking at the meeting.  I did not speak at the meeting.

16  None of the head teachers asked any questions at this meeting

17  either.  The meeting lasted about 30 minutes.  I left the

18  facility.  I did not speak to any of the employees after the

19  meeting before I left.

20       6. The second time that I was at LEX prior to August 23,

21  2010 was the following week, the week of August 9, 2010, but I do

22  not recall which day of the week that I was there.  Joanna called

23  me between the LEX meeting and the week of August 9, 2010, and

24  told me to go to LEX and speak to the employees individually to

25  see if they had any questions about the District Council 1707

26  (Union).  Joanna said that she wanted me to do this because the

27  employees did not ask any questions in our meeting.  On the day

4



FORM NLRB-5168
(2-08)

1    during the week of August 9, I went to LEX around 1 p.m.   I

2    walked into Zoila De Las Nueces and Clarissa Ribera's classroom.

3    I had Exhibits A and B with me.   I asked them if they had any

4    questions based on the meeting we had the week before and/or if

5    they had any questions about the Union.   They said that they did

6    not have any questions and that they don't have anything to do

7    with the Union.   The conversation lasted less than 5 minutes.   I

8    did not say anything else to them, and they did not say anything

9    else to me.   I left Zoila and Clarissa's classroom and went to

10   Eve Apodaca's classroom.   Eve was working by herself at the time.

11   I showed Eve Exhibit A and B and asked her if she had any

12   questions.   Eve said that she understood everything from the

13   meeting before.   Eve said that if she had any questions she would

14   ask me later.   I left Eve's classroom, the conversation lasted

15   about two minutes.   After I left Eve's classroom, I went to

16   Janisse Santiago and Magaly Linares' classroom.   I walked into

17   their classroom, showed them Exhibit A and B.   Janisse said she

18   did not have any questions.   Magaly did not ask me any questions,

19   but she was reading a portion of Exhibit A out loud to herself

20   while I stood in front of her.   I do not recall which portion of

21   Exhibit A she was reading aloud.   I did not say anything else to

22   Janisse or Magaly and they did not say anything else to me.   The

23   conversation lasted about 7 minutes.   I left Janisse and Magaly's

24   classroom.   I walked outside of the gate at Reina Peralta and

25   Dianna DeLeon's classroom.   There is a three foot tall baby gate

26   across the classroom door.   Reina and Dianna walked up to the

27   inside of the gate.   To the left of Reina and Dianna's classroom



FORM NLRB-5168
(2-08)

1   was Lorraine Aguirre and Veronica Jean's classroom.  They also

2   have a three foot baby gate at their doorway and they walked up

3   to the inside of their gate.  I was standing in between the two

4   classrooms, which are about one foot apart.  I was holding

5   Exhibit A and B in my hand.  I asked if they had any questions

6   from our meeting the week before.  Lorraine and Veronica said

7   that they did not have any questions.  Dianna and Reina were

8   laughing and making faces at each other.  Reina said that they

9   have all the information they need because they did their own

10  research on the internet.  They continued laughing.  Reina said

11  that they would make the decision that is best for them.  I did

12  not respond.  I said that they probably knew more than I did.

13  The conversation lasted about 5 minutes.  I did not say anything

14  else and neither did they.  I walked away.  I forgot to go to

15  Dianna Riopedre and Evelyn Aguirre's classroom that day, because

16  it is not located right next to everyone else's and I had

17  forgotten about it.  I did not talk to Dianna Riopedre or Evelyn

18  Aguirre that day.  I left LEX around 2:30 p.m.

19       7. I was on vacation from August 16 until I reported to

20  work on August 23, 2010.

21       8. I do not recall any conversations with any employee

22  during the week of August 23.  That first week, I spent most of

23  my time in the classrooms trying to learn the names of the

24  students in each classroom and observe the employees while they

25  worked.

26       9. I do not have any contact with anyone at WE, including

27  the bookkeeper or the site director.  I was not informed

6



FORM NLRB-5168
(2-08)

1  regarding what was going on at WE.  I did see the New York Daily

2  News article published on August 22, 2010, when Kelly showed it

3  to me online during my first week.  I did not speak to Joanna

4  about the New York Daily News article.  I did not speak to Joanna

5  about what was going on at WE with their employees or the

6  employees' organizing campaign.  I did not speak to Jill Howard

7  or Mego Gojka, managing director, about what was going on at WE

8  with their employees or the employees' organizing campaign.  The

9  extent of any knowledge that I have about WE and what happened at

10  their facility between August 23, 2010 to date is the New York

11  Daily News article.

12      10.  I was not involved in the decision to terminate Dianna

13  DeLeon on August 24, 2010.  I was in the office when Gail handed

14  Dianna DeLeon a termination letter.  I recall that Gail said that

15  because Dianna DeLeon gave a false statement in the New York

16  Daily News article about having a bachelor's degree when she did

17  not, because we were unable to obtain her fingerprints, and

18  because there was no evidence that she was ever fingerprinted,

19  Dianna's contract was not being renewed.  Dianna DeLeon did not

20  say anything.  The conversation lasted one minute.  Either Kelly

21  or Gail told me that they had asked Dianna DeLeon on August 23,

22  2010 to bring in her fingerprints the following day, but she did

23  not do so.  I walked Dianna DeLeon from the office to her

24  classroom.  I did not speak to her while we walked.  I watched

25  Dianna DeLeon grab a few of her belongings from her classroom and

26  call someone on her cell phone and read her termination letter.

27  This took about 10 minutes, and during these 10 minutes, I stood

FORM NLRB-5168
(2-08)

1   behind the gate and waited for her.  When she was finished, she

2   went into each individual classroom and said good bye to all of

3   the teachers.  I followed her until she was done.  I did not

4   speak to her during this time.  About 5 minutes later, I walked

5   her out of the building.  I did not say anything to her while we

6   walked.  Diana DeLeon did not say anything to me while we walked

7   from the office to her classroom, around to each classroom or

8   from the classrooms out of the building.

9        11.  None of the employees spoke to me about why Dianna

10  DeLeon was fired.  I heard Dianna DeLeon telling employees while

11  she was saying goodbye to them on August 24, 2010.

12       12.  On or around August 25 or 26, I spoke to Reina Peralta

13  when she was walking in from lunch between 11 a.m. and 12 p.m. or

14  between 3 p.m. and 4 p.m.  I was sitting in the office and I

15  called her as she walked by.  I asked her where her letter of

16  resignation was.  Reina Peralta said that she did not write it

17  yet.  I said that if she wanted, she could write it right now

18  because Gail was covering for her in her classroom during Reina's

19  lunch.  Reina sat down at Kelly's computer to write the letter,

20  but she was having trouble with Kelly's keyboard and Reina said

21  that she would write the letter that night.  I told her that if

22  she wanted, she could just handwrite the letter.  Reina said that

23  she would write it in her classroom.  I said okay.  The

24  interaction with Reina lasted about 5 minutes.  This is the first

25  conversation that I had with Reina about her resignation.  At the

26  end of the day, around 5 p.m., I went to Reina's classroom to

27  retrieve Reina's letter of resignation.  I asked her if she had

FORM NLRB-5168
(2-08)

1 written her letter of resignation. Reina said that she hadn't
2 gotten a chance. I said okay. Reina said that she would write
3 it right now if I would change her baby's diaper. I changed four
4 diapers while she sat down with a paper and pencil. While I was
5 changing diapers, Reina sat ~~at a table~~ on the floor and appeared
6 to be writing on a piece of paper. I changed four diapers and I
7 asked her if she was finished. Reina said that she would write
8 it tonight. I asked why she did not tell me that because I just
9 changed all those diapers. After this conversation, I sat on the
10 floor and played with the kids while Reina talked to the parents
11 who came to pick up their children. I did not speak to Reina
12 again that day, during or after the parents were coming to pick
13 up their children. I heard Reina talking to parents about the
14 children and how their day was. I also heard her telling parents
15 that Dianna DeLeon was fired in the middle of the day and wasn't
16 allowed to stay. Reina explained to parents that she wanted a
17 union and more representation at the facility. Reina said that
18 she was leaving, and that she had a nanny position. I watched
19 Reina talk to about four parents, and that is all I heard her say
20 to them.

21       13. Throughout the week of August 23, 2010, I spoke to
22 Kelly about Reina Peralta's work performance. These
23 conversations would occur when we were watching the video of
24 Reina Peralta's classroom in the office. Kelly and I discussed
25 that Reina Peralta was talking negatively to the parents about
26 the school. I do not recall what she Reina Peralta said that was
27 negative about the school. It happened several times a day. We

9

FORM NLRB-5168
(2-08)

1   also noticed during that week that Reina would often sit away

2   from her students with her back to them and talk on her cellular

3   phone.  I was told during this week, Kelly told me that Reina was

4   not going to be allowed to stay past the end of the school year

5   which occurred on August 31, 2010.  Kelly did not tell me who

6   made this decision.  I do not know who made the decision to ask

7   Reina to leave on August 27, 2010.

8        14.  On August 26, 2010, at the end of the day, Jill Howard

9   called me and said that she was coming to LEX in the morning.

10   She did not tell me why.  I said okay.  I did not have any

11   conversations with Jill, Mego Gojka or Joanna about Reina Peralta

12   at all.

13        15.  On August 27, 2010, around 8:45 a.m., Jill Howard came

14   to LEX.  Jill did not tell me why she was there.  A few minutes

15   later, when Reina Peralta walked into work in the morning, she

16   walked into the office and handed me a handwritten resignation

17   notice.  There was no conversation, Reina Peralta handed me the

18   notice and walked away.  The handwritten letter is attached as

19   Exhibit C.  Jill Howard was in the office at the time, but did

20   not speak to Reina Peralta.  Jill Howard and I read the letters

21   and Jill told me that three people would be handed letters that

22   day.  Jill and I discussed whether or not to space them out or to

23   give them to the three employees at once.  Jill Howard did not

24   tell me why the decision was made to tell Reina Peralta to leave

25   early.  I knew that Magaly and Evelyn were being let go because

26   of the conversation that I had with Kelly and Gail on August 23.

27   Jill and I decided that we would stagger giving out the letters,

10

FORM NLRB-5168
(2-08)

1   and I volunteered to speak to the employees.  Around 10 a.m., I
2   went to Reina Peralta's classroom and asked her to come to the
3   office, I left, went to the office.  Reina was a following me to
4   the office and we did not speak during this time.  Reina walked
5   into the office right after I did.  Jill and Kelly were both
6   present.  I handed Reina a letter that said she was being asked
7   to leave today, before her requested resignation date of
8   September 7, 2010.  I told Reina that her work performance was
9   unsatisfactory because she was constantly on her phone, ignoring
10  her children and gossiping to the parents about the school.  A
11  copy of this letter is attached as Exhibit D.  Reina asked for a
12  copy of her personnel file.  Kelly got up, got Reina's file, made
13  copies and handed them to Reina.  There was no conversation
14  between Kelly and Reina.  Reina asked Kelly for a hug goodbye.  I
15  did not say anything else.  Neither Jill nor Kelly said anything
16  during this conversation.  The conversation lasted about 3
17  minutes.  I walked Reina to her room, watched her pack her stuff
18  and walked her out the door.  We did not speak to each other
19  while we walked together.
20       16.  On or around August 27, 2010, around 11 a.m., I asked
21  Evelyn Aguirre to come to the office to speak to me.  Evelyn came
22  to the office.  In the office was Kelly, Gail and Jill.  I told
23  Evelyn that based on her absences and latenesses we could not
24  renew her contract.  Evelyn did not respond.  I had received
25  Evelyn's letter from Jill.  Jill did not say anything to me when
26  she gave me Evelyn's letter.  A copy of the letter is attached
27  hereto as Exhibit E.  The conversation in the office lasted about



11

FORM NLRB-5168
(2-08)

1   one minute.  Evelyn went to her classroom, gathered her things

2   and walked back into the office.  When she did, she asked me for

3   a copy of her written warning and/or write-up.  I do not recall

4   what the written warning and/or write-up was or what it was for,

5   but she asked me to remove the written warning and/or write up

6   from her personnel file.  I made Evelyn a copy of the written

7   warning and/or write-up and gave it to her.  I recall initialing

8   something on her written warning and/or write-up, but I don't

9   remember why.  I recall that I verified the change to the written

10  warning and/or write-up with Gail and Kelly, and then initialed

11  the change, made a copy and gave it to Evelyn.  Around 11:30

12  a.m., I went to Magaly's classroom and asked her to come to the

13  office.  A few minutes later, Magaly came to the office.  At the

14  time, Kelly, Jill and Gail were also in the office.  I told

15  Magaly that based on her absences and latenesses, her contract

16  would not be renewed.  I asked her if she had any questions.  She

17  said that she did not.  Magaly got up and left the office.  The

18  conversation lasted about one minute.

19      17. Kelly Li is the bookkeeper at LEX.  Kelly's duties are

20  to collect tuition, receive orders from the staff and place the

21  order with headquarters.  Kelly keeps the attendance of the

22  children and the employees.  Kelly calculates the hours of

23  employees and submits them to payroll.  If I am not at LEX, Kelly

24  would act as the site director.  This has occurred three times

25  since I started.  Once, today while I provided this statement, ⌐while giving the first half

26  last week on October 14, for a half a day, and on September 17,  of this statement

27  2010, when I was out all day.  Kelly does not hire, fire or

FORM NLRB-5168
(2-08)

1 discipline employees. If an employee had a problem with a

2 paycheck, for example, the employee did not think that their

3 hours were calculated correctly, the employee would speak to

4 Kelly. I do not know if that has happened since I started. If

5 an employee calls out sick, they would call the LEX facility and

6 speak to either myself or Kelly, whoever answers the phone. If

7 an employee wants to take vacation leave for a day or for a whole

8 week, the employee would complete a request for leave form and

9 submit it to Kelly or myself. If the form was submitted by the

10 employee to me, I would initial that the leave request was

11 granted if there were no other employees taking leave on the

12 requested date(s). If the employee's request for leave is not

13 approved, I would verbally inform them. If an employee submits a

14 request for leave form to Kelly, Kelly would bring the request

15 for leave form to me and I would either initial that the request

16 was granted, or I would verbally inform the employee that their

17 leave request is not granted. I then give the request for leave

18 form back to Kelly and I do not know what she does with the

19 request for leave form after that. I see every request for leave

20 form submitted. There have only been three since I've been

21 there. If an employee requests a partial day off, the employee

22 may but does not always complete a request for leave form. If

23 the employee completes a request for leave form, the process is

24 the same as that for requesting vacation leave. No employees

25 have requested partial days off since I started.

26      18. I was not involved in the drafting of the employment

27 contracts signed around September 2010. I did not give copies of

13



FORM NLRB-5168
(2-08)

1  the employment contracts to the LEX employees to review or to

2  sign.  I do not know who solicited the employees to sign their

3  employment contracts around September 2010, and I do not know

4  when the contracts were signed.  By the time that I started

5  around August 23, 2010, the class assignments for the new school

6  year were already decided.  I do not know who assigned the

7  teachers to their classrooms.

8       19.  I have not performed any staff evaluations between the

9  time that I started to date.  I did not see any employee

10  evaluations for employees done in August or September 2010.  I

11  was not involved in the decisions regarding which employees'

12  employment contracts would be renewed in August and September

13  2010.  Aside from what I have stated herein, I do not know who

14  made the decision to not renew the contracts of employees in

15  August and September 2010.  In August and September 2010, I hired

16  one head teacher, Pamela Monahan, around August 31, 2010.

17       20.  I did not distribute any flyers, campaign literature

18  or other documents regarding the Union in employee mailboxes or

19  to employees.

20       21.  I do not recall any conversations with employees about

21  the Union from the time that I started to the present.

22       22.  On or around August 24, 2010, I distributed a letter

23  from Joanna in each individual student's mailboxes for the

24  parents.  I did not give a copy of this letter to any of the

25  staff members.  A copy of this letter is attached as Exhibit F.

14



FORM NLRB-5168
(2-08)

1    23. On or around September 7, a rally was held at LEX.  I

2  did not take any photographs and I do not recall Kelly or Gail

3  taking photos of the rally.

4    24. While I was a head teacher at Park Avenue, my

5  assistant teacher was Erica Forster.  Erica Forster's contract

6  was not renewed around August or September 2010, but she is

7  currently working at the Park Avenue facility until staffing

8  issues can be worked out.

9

10  I am being provided a copy of this Confidential Witness Affidavit
11  for my review. If, after reviewing this affidavit again I
12  remember anything else that is relevant, or desire to make any
13  changes, I will immediately notify the Board agent. I understand
14  that this affidavit is a confidential law enforcement record and
15  should not be shown to any person other than my attorney or other
16  person representing me in this proceeding.
17
18  I have read this statement consisting of 15 pages, including this
19  page.  I fully understand its contents, and I certify that it is
20  true and correct to the best of my knowledge and belief.
21
22
23
24                                     Gina Cavitolo
25  Sworn to before me at
26  26 Federal Plaza, Room 3614
27  New York, New York this
28  20th day of October 2010
29
30
31  Nicole Buffalano, Board Agent
32  National Labor Relations Board
33
34

15

# Union    VS    Non Union

| | Union | Non Union |
|---|---|---|
| **Salary** | Increase 2% of salary with **a four-year wage freeze** (ACS current union contract) | POA **increase 2% of salary, guaranteed every year especially in** the economic depression (Existing) |
| **Beginning Salary** | 11 % less than original rate ( ACS current union contract) | Higher than other child care centers **based on staff qualifications** |
| **Improved Credentials** | With a strict 5 years contract, union member cannot improve status with education. **No raise, no promotion** when teacher is working on their credits/license. Teacher can only can be the teacher, and the assistant can only can be the assistant | **Professional growth:** We promote staff based on the completion of qualifications. The assistant can be promoted to a teacher; the teacher can be promoted to director. **More qualifications = higher position with more pay** |
| **Qualifications** | **Very strict qualification requirements** with credentials and licenses ( review ACS teacher/assistant requirement with the union contract) | *Flexible schedule to support student teaching and schooling *Free college credits *Staff development *More Ed. credits = more pay |
| **Health Plan** | The labor law only requires a **private company** employer to pay **$100** for share co-payment. | We are currently contributing **$300** monthly for each employee who requires the health benefits (Existing) |
| **Retirement Plan** | **Not required** for a private Co. | We offer 401K plan with 3% match |
| **Vacation** | 8 Federal Holidays, **not required more days off for a private Co.** | 11 holidays, 12 sick/personal days and 2 weeks' vacation. **Same as ACS** |
| **Rules** | Many **restrictions** with schedule and other policies | More **flexibility** in the private company (Existing) |
| **Employee Child Care** | **No other** unionized day care provides employee child care | **Yes** (Existing) |
| **Relationships & Social effects** | **Hostile, disruption** (court battles, strike, replacement) | Big family oriented, friendship, and **harmony** |
| **Union Dues** | $500 per yr = -2% of your salary. | None |
| **Use of Dues** | *Increase union officials salary *Union salesperson commissions *Political activities and lobbying *Restaurant and hotels, gifts etc. | N/A |
| **Performance** | More unionized day care closing, more day care workers **layoffs** | POA is expanding, **more job opportunities** |
| **Management** | With union **bureaucracy** and policy, 16 unionized day care centers were closed in 2009 | **Efficient, direct and improving** |
| **Trend** | Union is **declining nationwide,** only 7% companies are unionized, they are all government agencies | More employee involvement, more **improvement** |

DC 1707 is not UFT (United Federation of Teachers), POA is a private company, all
benefits are only from the employer, not union. Compare to the unionized day care
centers or the private companies, we have offered a lot.

## Vote for NO UNION!!!!!

GOVERNMENT EXHIBIT

## QUESTIONS AND ANSWERS ABOUT THE UNION

In our discussions with employees about the Union election, several questions have come up that we thought we should share with everyone:

Q.   **I signed a card for the union. Do I have to vote for them in the election?**

A.   No. Even if you signed a card for the union, you have the right and the obligation to vote for what you think is in your best interests. If you do not want to pay union dues or worry about union strikes, you have the right to vote NO for NO UNION. Remember, this is a secret ballot election and no one will know how you voted.

Q.   **How much are union dues?**

A.   It is our understanding that union dues range from $23.50 to $41.20 per month. Almost all union contracts require that union dues be taken of your paycheck and sent directly to the union. Almost all union contracts require that all employees in the bargaining unit pay dues regardless of whether or not you like what has been negotiated in the contract. Right now, you do not have to pay dues to receive your current wage and benefit package which exceeds what is offered by all of our competitors.

Q.   **What do I get for my union dues?**

A.   According to the Union's most recent financial statement, it received last year $11,651,459 in revenue. Of that amount, the Union spent ZERO on behalf of individual members.

Q.   **What did the Union do with the money?**

A.   Most of the money goes to pay for the Union's expenses and overhead such as the salaries of Union officials. They spent $313,863 for political activities and lobbying and $65,184 for contributions, gifts and grants. Their expenses included over $5,000 for flowers, over



GOVERNMENT
EXHIBIT

$16,000 for taxis, over $30,000 for restaurants and over $40,000 for hotels.

Q.    What happens if the Union wins the election?

A.    The Union wins only the right to negotiate with management for a collective bargaining

agreement. In negotiations, there is NO guarantee that you will receive a better package of wages

and benefits than that you already receive. It is possible you might wind up with a package that is

the same, better or worse.

Q.    But what about the promises that the Union has been making?

A.    The Union can make all the promises they want, but that does not mean they will deliver.

The company has to agree to any improvements in wages or benefits before they become reality.

We can guarantee that we will not agree to an economic package that we could not afford, just

like we did not agree to the proposals the Union made the last time we negotiated with them.

Q.    Can't the Union force you to agree to their demands?

A.    The only thing a Union can do to try to force a company to agree to their demands is to

call a strike. We would not want a strike but we would prefer a strike over agreeing to an

economic package that we could not afford. In case of a strike, the employees who go on strike

would not get paid. How long could you afford to be without a paycheck? How would pay for

your rent and groceries and other expenses. Remember the Union has nothing to lose by calling a

strike. The Union organizers continue to get their paychecks when there is a strike. You can't

even collect unemployment benefits until after the strike lasts six weeks.

Q.    Won't the Union give me strike benefits?

A.    According to the Union's financial statement, it spent ZERO on strike benefits last year.

Q.    I want to be neutral. Can't I just not vote?

A.    Not voting is the same as voting for the union. The election is decided by a majority of

those who actually vote. You can be sure that the Union supporters will show up to vote. If you don't vote, that would mean the election would be decided by only those who want the Union. If you have any doubts about bringing the Union back, you should vote NO for NO UNION.

The election is August 2 between 1:00 and 3:00 p.m. in the gym. Please make sure that you vote.

**VOTE NO FOR NO UNION DUES**

**VOTE NO FOR NO UNION STRIKES**

**VOTE NO FOR NO UNION**

8/26

To whom it may concern.

I'm stating in this letter that I will be voting Yes for the union on September 7, 2010. I felt harrased and forced to write a resignation letter. I will be working for Preschool Of America years to come.

Sincerely





**PRESCHOOL of AMERICA**

25 Market Street, New York, NY 10002 Tel: 212-577-2710

August 26, 2010

Dear Ms. Reina Peralta,

We have completed our review of your attendance record and we found that from December 2009 to August 2010, you were absent 18 days, and took another 2 half days off. We also found that you were late 30 times during this period. Please find enclosed attendance records for your future reference. Based on your poor attendance, we cannot keep you as a staff member anymore and we will not give a renewal contract. Staff attendance is critical for this school's success, safety, and child care. Additionally, we must comply with Department of Health codes, especially with staff/children ratio at all times.

Since you already informed our office on August 20th that you are resigning from the company, we respect your decision and accept your request. Due to the new September semester approaching, we need to arrange new classes with new staff. We advise you to leave on August 27th, 2010 and your pay will be reflected until August 31st, 2010 and your employment with POA ends in the same day. Thank you for your cooperation.

We wish you the best of luck in your future endeavors.

Very truly yours,

Joanna Fan
Chief Executive Director

cc. Marc Bresky, Esq.
cc. Joseph Cacciato Esq.
cc. DC 1707



GOVERNMENT
EXHIBIT

D



25 Market Street, New York, NY 10002 Tel: 212-577-2710

August 18, 2010

Dear Ms. Evelyn Aguirre,

We have completed our review of your performance and attendance record. We found that from September 2009 to August 2010, you were absent 19 days, and took another 15 half days off. We also found that you were late more than 150 times during this period. Please find enclosed attendance records for your future reference. Based on your poor attendance, we cannot keep you as a staff member and we will not give a renewal contract. Staff attendance is critical for this school's success, safety, and child care. Additionally, we must comply with Department of Health codes, especially with staff/children ratio at all times.

Due to the new September semester approaching, we need to arrange new classes with new staff. We advise you to leave on August 27th, 2010 and your pay will be reflected until August 31st, 2010 and your employment with POA ends in the same day. Thank you for your cooperation.

We wish you the best of luck in your future endeavors.

Very truly yours,

Joanna Fan
Chief Executive Director



GOVERNMENT
EXHIBIT

E

# 👣 PRESCHOOL of 🧸 AMERICA 👣

1501 Lexington Avenue New York, New York 10029 Tel 212.987.3700 Fax 212.987.3344

Dear Valued Parents of Preschool of America Lexington,

I would like to take this opportunity to apologize for any confusion or discontent you have experienced recently. There has been a lot of speculation and frustration about the series of events that have been unfolding at school at this time and I would like to take this opportunity to explain as much as possible.

As you are probably already aware, we have eliminated the winter and spring breaks on the new 2010-2011 school calendar. We have also added an extra hour to the length of our business hours in order to meet your family's needs and schedules. We have done this without increasing tuition costs. The feedback that we have received from parents is very positive. Although we have eliminated two pre-established vacation times during the school year, we did <u>not</u> eliminate the much-needed vacation times for our teaching staff.

As a successful day care center, we understand the importance of employee benefits. We provide medical insurance, a 401K plan, free college for teachers registering for early childhood courses, discounted staff daycare costs for their children, paid benefit days. Staff members who have made a commitment to work for the company are rewarded for the work that they do at Preschool of America. They are able to receive up to 34 paid benefit days, including 12 holidays, 12 personal/sick days, and two weeks (10 days) of vacation.

In the past when school was closed for winter and spring breaks, all staff members had to take these two weeks of vacation every year. By changing the school calendar to remain open those two weeks, we award the same number of benefit days at times that the teachers are free to choose. This policy has been embraced by a majority of our centers, however the Lexington center is one of two centers that have chosen to take this matter up with DC1707 (the Union). Some staff members were under the impression that with representation of a union, they could demand that winter and spring breaks be reinstated or get more benefits. Thus the petition was filed and a union election will be held in the beginning of September.

On August 22, our employee Ms. Dianna DeLeon made a false statement to Daily News that she had a Bachelor degree making $10 per hour as a teacher. The truth is that she does not have BA degree and she was hired as an assistant. Our teachers are offered $28,000-$45,000 based on their degrees, certification, and experience. She also stated that people were being threatened to be fired if they joined the union, which is obviously as far from the truth as possible. She has misled the media and public on her position, degree and our teacher's salary which caused huge damage to this school. Yesterday,



GOVERNMENT EXHIBIT

August 23rd, three men from DC1707 (the Union) were standing outside of our Lexington center handing out an article written in the Daily News with Ms. DeLeon's false statement. I sincerely apologize for the inconvenience and misinformation that has resulted from these incidents, but I am confident that under new leadership, the school will flourish and thrive- and new teachers and assistant teachers will bring a highly professional aspect to our current staff.

As always, we are dedicated to open communication and we look forward to addressing your needs now and in the future. I hope this letter provides a better understanding of the issues we are facing and our sincerest desire to please the most important members of our community: children, families, and staff members.

Warmest Regards,


Joanna Fan
Chief Executive Director