FORM NLRB-5168
(2-08)

City of New York

Case Nos. 2-CA-39988
2-CA-40056

County of New York

**Confidential Witness Affidavit**

I, Kathy Huang, being first duly sworn upon my oath, hereby state as follows:

I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding.[1]

My business address is 101 West End Avenue, New York, New York 10023.

My telephone number is 212-362-0135.

I am employed by Preschool of America ("the Employer") as the Bookkeeper for the Employer's facility located at 101 West End Avenue, New York, New York 10023.

1. I began working for the Employer at its facility at 101 West End Ave. (WE) on or about June 2009. Prior to this, I was employed part-time as a teacher with Red Apple, another preschool owned and/or controlled by Joanna Fan (Joanna).

2. As the bookkeeper my duties are to collect tuition, order school supplies, collect hours worked by the employees at WE and submit those hours to Michelle Zhang, accountant, at

---

[1] **PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.





FORM NLRB-5168
(2-08)

Employer headquarters, collect and submit student attendance on a monthly basis to Stephanie Zhu at headquarters, note the attendance of the teachers and assistant teachers in my notebook and enter the information into a computer system. I maintain several other documents that show employee time and attendance besides my notebook, including a weekly absence spreadsheet, a yearly summary of absences and latenesses which I prepared in late July or early August 2010, a payroll summary that I prepare each pay period which I use to submit employee hours to headquarters. The most accurate document is the payroll summary that I prepare bi-weekly, as some employees may request to leave early from work and I do not always record that in my notebook. I work in the main office at WE, which contains two desks in one room, one desk is where Robin works and one desk is where I work.

3. Regarding the employee attendance in my notebook, I record the employee's name in my notebook if an employee calls out sick, if an employee is late by at least one hour, if an employee leaves work early or if an employee is on planned leave. This notebook does not reflect whether or not any planned leave is approved, it is just for me to submit the payroll. Not all of the employees have the same schedule, the start time may be 8 a.m.; 8:30 a.m. or 9 a.m.; and their scheduled departure time may be 5 p.m.; 5:30 p.m. or 6 p.m. Employee attendance is reflected in my notebook, the time clock computer system and my payroll submission to headquarters. In addition, I provide a monthly report of employees' latenesses tc Robin Mauro (Robin), WE site director since June 7, 2010, by printing out the punches in and





FORM NLRB-5168
(2-08)

out from the time clock software. This printout would also show who was absent from work, as there would be no punch in or punch out information in the printout. The printout is not 100% accurate as sometimes people forget to punch in or out and/or the computer may go down for a period of time. The previous director, Catherine Madaio did not care about employee attendance like Robin did, so I did not provide her with a monthly report. Currently, at the end of each month, I print out all of the time punches from the computer for all of the WE employees and highlight the late punches. I then submit these documents to Robin. I started providing Robin with these documents monthly, beginning at the end of June 2010.

4. When an employee needs to take a vacation and/or take other planned personal leave, including requests to take partial days off, the employee would usually complete a request for leave form either before or after which they can find in the office or in their classrooms. It is WE's preference that employees provide at least five days notice, but we do require employees taking leave within the next five days to complete a request for leave form, even if it occurs after the absences. In those circumstances, the employee would make their request for leave verbally to Robin beforehand. I have heard employees request planned leave verbally to Robin, but they always also fill out a request for leave form. The request for leave form contains the employee's name, the reason they are requesting leave, the dates and times they are requesting off and a line for the site director's approval of the leave. The employees then submit the





FORM NLRB-5168
(2-08)

leave requests to me or to Robin. When I see the request for leave form, the form may have been approved, i.e. initialed by Robin, or it may not have. I record employee's planned absences on a daily and weekly basis in a document that reflects who has requested leave for a given day as well as in my daily attendance notebook. That way I can plan to have coverage. There is one of these documents for each week since Robin started on or around June 7, 2010. The weekly leave document is saved for six months in a cabinet in the office. Anytime that I receive an employee's request for leave form, regardless of whether or not Robin has approved the leave yet, I will look at my weekly leave document to see whether or not there are already too many employees scheduled to be off on the requested day. Too many employees requesting leave on any given day would be about three. If I look at my weekly leave document and there are already two approved absences on a given day and Robin has initialed the submitted request for leave form, I will record that employee's absence on my request for leave form. If I look at my weekly leave document and there are already two approved absence on a given day and Robin has not initialed the submitted request for leave form, I will speak to Robin. For example, I would ask Robin if she had spoken to that employee and she had approved the leave verbally. If Robin says that she has, I will go back and record the approved leave in my weekly leave document. If Robin says no she hadn't received or approved the request, I will tell her that there are already two people out that day and I ask her if she will still approve it. Sometimes Robin says to ask the

FORM NLRB-5168
(2-08)

employee to change their appointment to another day, and sometimes the employee does and sometimes they don't. If the employee will not change the date, and Robin does not approve the employee's request, she says that if the employee has to take the leave, then they have to take the leave, and I will record the leave in my weekly leave document. In these circumstances, Robin would not approve the leave, but would write "notified" on the leave request form. There are instances where Robin does not approve an employee's request for leave. This has happened once since Robin started. If Robin approves the leave request, she will check a box on the request for leave form that says approved and will sign the form. If Robin denies the leave request, she will write "notified" on the request for leave form and will sign the form. Prior to September 2010, I did not maintain the leave request forms, and instead I would throw them away after I had recorded the absences. Beginning around September 2010, once the leave request form was approved by Robin or not, the form is then placed in a binder on my desk, and after the date the employee takes off, I place the request for leave form in the employee's personnel file. Since around June 7 when Robin started, the personnel files are not purged. ~~and each request for leave form is put into the employee's personnel file.~~ Prior to Robin's start, Catherine would throw things away from employee personnel files. If a request for leave is submitted in advance, WE does not require any type of documentation to substantiate the leave request. In addition, I use my notebook and the weekly leave document to prepare a bi-weekly payroll summary where I calculate





FORM NLRB-5168
(2-08)

the hours each employee worked to be submitted to payroll at headquarters.

5. Prior to September 2010, the policy with respect to paid leave is that an employee does not receive any paid leave for their six-month probationary period, and they are paid for 3 sick/personal/vacation days from 6-12 months of employment; and 6 sick/personal vacation days from 12 - 24 months of employment; and 12 sick/personal/vacation days over 24 months of employment. In addition, any sick leave over one day in a month is unpaid; and if an employee does not take one sick day in a month, the employee is paid for that sick day on the 15th of the following month.

6. When an employee calls in sick, the employee calls the office and leaves a message and/or sends me a text message on my cell phone. The employees are required to provide a doctor's note if they call out sick. The doctor's note is then placed in their personnel file. If the doctor's note is submitted to me, I will place the doctor's note in the employee's personnel file. Prior to Robin starting, Catherine would throw things out of employee personnel files. If an employee does not provide a doctor's note for a sick day, I will follow up with the employee and ask for one. There are times when I follow up with an employee regarding a doctor's note and I still do not receive one. If that happens, I will report that to Robin. I do not know what Robin does with that information. I do not go back into the employee's personnel file at a later date to make sure that Robin was able to secure a doctor's note.





FORM NLRB-5168
(2-08)

7. I do not have the authority to hire, fire, assign employees to classrooms, give raises, or discipline. I add up all of the employee's hours and submit them to payroll, excluding any unpaid leave that they took. I do the payroll on a two week basis. I record the payroll for that two week period on a spread sheet. These documents have been maintained for the last year in a cabinet in the office. In addition, if an employee has an issue with their payroll, for example they think they were not paid for the correct number of hours, the employee would come to me and I would show them how their hours were calculated. I have never had to contact headquarters to have an employee's payroll for that period adjusted because I have not been wrong about an employee's hours. I do report to Robin when I see a teacher breaking a school rule, like napping, eating or talking on their cellular phones in the classrooms, but I do not recommend what action that Robin should take. The personnel files are located in the office, but are not locked. The only person, besides myself, that I have seen looking in the personnel files are Robin. I did not see Robin's annual evaluations in 2010, and I did not place them in the employee's personnel files. These documents are kept in a cabinet on Robin's desk.

8. I am also responsible to order the classroom, office and cleaning supplies for WE. I receive the requests for classroom supplies from the teachers, and I sometimes talk to Robin about their requests to see if she thinks the teacher really needs the requested supplies. I then submit the request to Francis Wang,

FORM NLRB-5168
(2-08)

office manager, at headquarters. I do not know the dollar amount of WE's orders per month.

9. I report to Robin. I have never been disciplined. I do not receive reviews of my work from anyone. No one instructs me on how to perform my duties on a daily basis; I know what I am supposed to do.

10. On or around April or May 2010, I had a conversation with Tatiana Navia in her classroom. Kallyope Reyes was in the classroom at the time we had the conversation, but I am not sure if she heard us talking or not. I told Tatiana Navia that she had been late every day. Tatiana Navia said that she's a single mom and she has to take her daughter to her mom's apartment every day and that's why she's always late for work. I said okay. Then we talked about the students for a few minutes. The conversation lasted about five minutes.

11. On or around June 7, 2010, when Robin started, I had a conversation with Robin about problems that had been occurring at WE. I told Robin that some of the staff, and mostly the assistants were reporting to work late every day. I also said that many of the employees were calling out sick on Mondays and Fridays, and that a lot of them were lying down, using their cell phones, eating and/or napping in their classrooms. I told Robin that Tameka Singleton would lie down on the floor and use her cell phone, that Hope Dublin was eating in her classroom, that Zullay Pichardo was always coming late, that Anesia Lloyd was reporting to work late almost every day, that Amanda Nunes would usually report to work five to ten minutes late every day, that





FORM NLRB-5168
(2-08)

Catherine Duran would report to work five to ten minutes late frequently, and that those employees I just named had a lot of absences. I also told Robin that Joan DeLeon was late frequently and that Hope Dublin called out a lot. Robin said okay, that she would enforce the time and attendance rules. After this date, she was frequently in the classrooms observing the teachers during working time while Jill Howard (Jill), managing director, and I performed the office work. Jill was at WE on and off for about two weeks after Robin started. Soon after Robin started, I saw Robin going through the employee's personnel files. I recall that within the first two weeks, Robin said that she needed to replace some of this staff because of their work performances and attendance. I do not recall her saying anything specific about why she wanted to terminate a specific employee at that time. I do not recall her saying which employees she wanted to terminate around this time. During Robin's first two weeks, if I saw Robin going through a specific employee's personnel file, I would tell her the problems that I was aware of with that employee, including work performance issues and time and attendance issues. Robin looked through the employees' personnel files and we discussed their performance for about the first two weeks.

12. On or around late July or early August, I used my bi-weekly payroll summary which I create bi-weekly to calculate employees hours for payroll to create a summary that showed how many days each employee was absent from work for the time period of September 2009 through August 2010. The summary included all of the days that each employee was out, which included approved

FORM NLRB-5168
(2-08)

vacation, approved and unapproved sick leave and approved and unapproved personal leave. I used this summary to make a chart showing the names of each employee who used over their allotted vacation/sick/personal leave, including the number of full days, partial days and their number of allotted days. I submitted this chart to Robin. Neither Robin nor Joanna asked me to provide this information, I did so because I knew that it was time to review the employee contracts and decide which employees would stay for the 2010-2011 year.

13. On or around June 15, 2010, I received a phone call from Joanna Fan, owner, asking if I had heard anything about a union at WE. I said that Catherine Madaio had talked to me and the employees about one before she left. I do not recall Joanna's response. Then Joanna asked to talk to Jill. I handed Jill the phone. Between the time that I got off the phone with Joanna and the end of the following day, I spoke to Kallyope Reyes, Tatiana Navia, Anna Catsnelson, Maria Estrada and Catherine Duran about a union. I chose those five employees because I knew them the best. I spoke to Kallyope Reyes in room 11, formerly the brown bears classroom. I stopped by Kallyope Reyes' classroom and told her to come with me to room 11 because I had a question for her. It was just the two of us in the classroom. I asked Kallyope Reyes if she knew anything about a union. She said no. I asked her if she was sure because two people came to Joanna and said that most of the teachers want to join a union. Kallyope said that she did not know anything about a union. I do not recall anything else from the conversation. I





FORM NLRB-5168
(2-08)

spoke to Kallyope Reyes for about five minutes and then she went back to work. I had the same conversation with Tatiana Navia, after I went into her classroom and asked her to come with me to room 11 because I had a question for her. We went into room 11 alone, and I asked her if she knew anything about a union. Tatiana Navia said no. I said oh, that's weird because two people came to Joanna saying that you guys wanted to join a union. Tatiana Navia said no. The conversation ended, and it lasted less than 5 minutes. That's all that I recall from the conversation. I had the same conversation with Anna Catsnelson, after I went into her classroom during naptime, and asked her if she knew anything about the union. No other employees were present, but her students were sleeping in the classroom. Anna Catsnelson said no. The conversation ended, and it lasted less than a minute. That's all that I recall from the conversation. I went into Maria Estrada and Catherine Duran's classroom during lunchtime. I spoke to both of them at the same time. I asked if they knew anything about a union. They both said they did not. I said thank you and left their classroom. No one else was present for this conversation. The conversation lasted less than a minute. I then called Joanna and told her that I had spoken to a few of the staff and that there was no issue about the Union and nobody knew about the union. Joanna said okay, and that's why she thought that Catherine had forged employees signatures.

14. On or around June 21, 2010, Joanna came to WE with a form for employees to sign. She met with employees between 1 p.m. to 3 p.m. in the tv room. During this time, I would go to a

FORM NLRB-5168
(2-08)

classroom and tell the teacher to go meet with Joanna in the tv room. I would cover for the teacher until they were finished speaking to Joanna. I went to each classroom and sent everyone that was present that day to speak with Joanna. Each employee was in the tv room speaking with Joanna for about 10-20 minutes. When Joanna came out of the tv room, I asked her if she wanted to talk to anyone else. Joanna said that some of the employees did not sign and some were not at work on that day, so Joanna gave me copies of the form and asked me to have them sign the form. A copy of this form is attached as Exhibit A. Joanna did not tell me which employees did not sign the form. I do not recall how I knew which employees did not sign the form. I recall that on the following day, I approached at least four employees with the form Joanna gave me. Those four employees either were not present or had not signed the form the previous day. I do not recall how many forms I had signed that day, and I only recall three employees that I approached, including Sara May, Tatiana Gibbs, Anna Catsnelson and Antonette Monroe. Tatiana Gibbs had not met with Joanna the previous day, but Antonette and Sara May had but did not sign the forms. I do not recall how I knew that Antonette and Sara May had not signed the form because I do not recall Joanna telling me who signed the forms and who did not. I do not recall where, but I recall that I gave Sara May Joanna's form and said that this is the form from Joanna. Sara May did not say anything to me. I do not remember if I said anything else, and I do not remember if Sara May signed the form right in front of me, or if she dropped it off at the office later. ~~but~~





~~Sara May submitted a signed form that day.~~ I recall that I also gave Tatiana Gibbs, Anna Catsnelson and Antonette Monroe a copy of the form, but I do not recall what I said to them when I gave them the form. Antonette Monroe and Tatiana Gibbs signed the form. Anna Catsnelson did not sign the form. She is the only one who did not sign the form. Near the end of the day on or around June 22, I faxed Joanna the signed forms that I received from employees that day. At some time during the same day, I told Robin that Anna Catsnelson did not sign Joanna's form. Robin said okay, no problem.

15. The following day, on or around June 23, 2010, around 12:30 p.m., I watched Robin type up a document. Around 1 p.m., Robin gave me the document and said that if I saw Anna Catsnelson, to give it to Anna Catsnelson. A copy of this document is attached hereto as Exhibit B. Around 2 p.m., I saw Anna Catsnelson walk by the office on her way out of the building for lunch, and I got Anna Catnelson's attention and she stopped in front of the office door. I handed her Robin's form, Exhibit B, and said Robin wanted me to give this to you. Anna Catsnelson said okay and walked out of the building. To the best of my recollection, Anna Catsnelson did not return a signed form to myself or anyone else. I did not speak to Anna Catsnelson about either form after this date.

16. On July 14, 2010, in the morning, Wendy Puello called me in the office and said that she had to attend a meeting for the following day and so she will not be into work. I said okay. Wendy Puello did not fill out a request for leave form on this

FORM NLRB-5168
(2-08)

occasion, and I do not recall asking her to. I told her to bring in something to prove that she really had a meeting. She said okay, no problem. The conversation ended. I wrote that Wendy Puello would be out on July 15, 2010, in weekly attendance sheet. Around 4:30 p.m. the same day, I received a telephone call from Jennie Vasquez. I was in the office. Jennie Vasquez said that she would not be into work on July 15, 2010 because she had a hearing to attend. I told her to being me a document to prove that she had to attend a hearing. Jennie Vasquez said okay, no problem. On July 14, 2010, while I was speaking to Wendy Puello and Jennie Vasquez, I knew that there was a hearing at the NLRB on July 15, 2010. Around 7 p.m., I texted Robin saying that since Jennie and Wendy would be out the following day, I might need help from another school. I texted Robin that evening because there were three other employees scheduled to be absent and three were scheduled to leave early on July 15.

17. I did not speak to Robin about her decisions not to renew employee contracts in August 2010. I did not consult with Robin about which employees should not have their contracts renewed in August 2010. I did not speak to Joanna about Robin's decision not to renew employee contracts in August 2010. I had spoken to Joanna about WE employee time and attendance around May 2010. I recall that I called her to ask for her help, and I told her that WE had a problem with employee attendance. I did not mention which employees that I was having problems with, but just told her that we generally have a problem. Joanna said that she would fix it. Joanna said that she wanted to replace Catherine





FORM NLRB-5168
(2-08)

because she was not a good manager. Outside of this conversation, I did not speak to Joanna about WE employee time and attendance or specific employees and their time and attendance records at any other time.

18. On or around August 13, 2010, I heard Robin leave a message for Catherine Duran asking her to call her back. Robin was scheduled to be on vacation August 16 to return on August 23. On August 13, before the end of the day, Robin told me that Joanna had mailed a letter to Catherine Duran informing her that her contract was not being renewed. Robin said that she tried to call Catherine, but was not able to reach Catherine. Robin said that Catherine might not get the message, and might show up for work on Monday. Robin said that if Catherine showed up at work, I should have Catherine call Robin. On Monday, August 16, 2010, Catherine Duran arrived at work. When I saw Catherine Duran come to work, I called Robin and asked what I should do. Robin said to get Catherine Duran and call Robin from the office. I went upstairs and asked Catherine Duran to come to the office. About 10 minutes later, Catherine appeared in the office with Julian DeJesus (Julian). I called Robin and told her that Catherine and Julian were there. The only thing that I recall from the phone call was that Robin said that based on Catherine Duran's performance and latenesses and absences, your contract ended. I don't remember what, if anything else Robin said. I do not recall Catherine Duran speaking during the conversation. I do recall that Julian spoke, but I don't recall what he said.

FORM NLRB-5168
(2-08)

19. On or around August 19, 2010, I was at WE while about 30 people, including Union representatives and most of the WE employees whose contracts were not renewed excluding Tatiana Gibbs, Julian, and other Union representatives whom I did not know, gathered outside of WE just a few feet from the front door, carrying signs, chanting and handing out flyers to parents. This began around 4:30 p.m. and ended around 6:30 p.m. I took about 9 pictures of the people from inside the front door. I have provided copies of these pictures to the Board Agent.

I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this affidavit again I remember anything else that is relevant, or desire to make any changes, I will immediately notify the Board agent. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this statement consisting of 16 pages, including this page. I fully understand its contents, and I certify that it is true and correct to the best of my knowledge and belief.

Kathy Huang

Sworn to before me at
26 Federal Plaza, Room 3614
New York, New York this
14th day of October 2010

Nicole Buffalano, Board Agent,
National Labor Relations Board

June 21, 2010

To Whom It May Concern:

My name is ______________________________, and I am currently working at Preschool of America, 101 West End Ave, New York, NY 10023. I never heard of DC 1701, I have no intention to join the Union, if someone had put my name for this matter that was the misrepresentation.

I have not been coerced into sign this and will not be retaliated against if I choose not to sign this.

Sincerely yours,



I have not petitioned for union membership, I have not signed any union enrollment forms, and I am not going to petition for union me membership while employed by POA.

______________________________

Name

