FORM NLRB-5168
(2-08)

1  City of New York
2                                              Case Nos. 2-CA-39988
3                                                       2-CA-40006
4  County of New York
5
6               **Confidential Witness Affidavit**
7  I, Gail Wells, being duly sworn upon my oath, hereby affirm as
8  follows:
9
10 I have been given assurances by an agent of the National Labor
11 Relations Board that this Confidential Witness Affidavit will be
12 considered a confidential law enforcement record by the Board and
13 will not be disclosed unless it becomes necessary to produce the
14 Confidential Witness Affidavit in connection with a formal
15 proceeding.[1]
16
17 My address is: 90 Schenck Avenue 1E, Great Neck, NY 11021.
18 My telephone number is:  516-633-1543.
19
20     1.    I was employed by Preschool of America (Employer) as
21 the site director at the Lexington Avenue facility (Lexington),
22 from June 1, 2010 until September 13, 2010.  Prior to the time I
23 was hired, I interviewed with Jill Howard and Mego Gojka on one
24 occasion.  When I met with Jill and Mego they told me that I
25 needed to oversee the children, the staff, manage the
26 relationship between the Employer and the parents, and monitor
27 enrollment.  Neither Jill nor Mego told me anything in particular
28 about the staff at Lexington, i.e. that there were any problems
29 with any employees' work performance, or that there were any
30 general problems like time and attendance issues with the staff
31 at Lexington.  I have never worked for the Employer prior to June
32 1, 2010.  Soon before I was hired, I met Joanna Fan (Joanna)

---

[1] **PRIVACY ACT STATEMENT**
Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary. However, failure to supply the information may cause the NLRB to refuse to process any further

1



FORM NLRB-5168
(2-08)

1  owner, at her office at the Red Apple Preschool in Chinatown. It
2  was just the two of us, and was a quick introduction. Joanna did
3  not tell me anything about the staff in particular, or what I
4  should focus on when I started. Joanna told me what my hours and
5  salary would be when I started. This meeting lasted about 10
6  minutes. Between the time that I began interviewing with the
7  Employer and the time that I was fired, I was never told that
8  employees had employment contracts, or that I could not terminate
9  an employee during the school year. I was not told that I needed
10 to perform annual employee evaluations, nor was I told anything
11 about employee evaluations.
12       2.   I started on or around June 1, 2010. Lisa Terlizzi
13 (Lisa), the former site director at Lexington continued to work
14 during my first two weeks at Lexington. I recall that Lisa took
15 a vacation during my second week of employment, but that she was
16 available by telephone. When I started, Lisa told me that Kelly
17 Li, bookkeeper, was responsible for tuition billing, time and
18 attendance printouts, student enrollment, updating class lists,
19 ordering supplies, contacting the repair people and communicating
20 with the cook because they all spoke Chinese. When Joanna would
21 call Lexington, Kelly would speak with Joanna in Chinese, and I
22 could not understand what she was saying.
23       3.   When I started around June 1, 2010, Lisa did not tell
24 me she had any specific problems with any specific staff members.
25 Lisa did not tell me that she had specific time and attendance or
26 other work performance issues with any of the Lexington staff,

an unfair labor practice or representation case, or may cause the NLRB to issue you a subpoena and seek enforcement of the subpoena in federal court.

FORM NLRB-5168
(2-08)

1  including Reina Peralta, Magaly Linares, Dianna DeLeon and/or
2  Evelyn Aguirre.  Lisa did not tell me that she made any decisions
3  regarding classroom assignments for the fall, or that she had
4  decided that specific employees' contracts would or would not be
5  renewed for the fall.  Lisa did not tell me that she had decided
6  not to renew the contracts of Reina Peralta, Magaly Linares,
7  and/or Evelyn Aguirre for September 2010.  On or around the time
8  I started, Lisa did not say that she was unhappy with the staff
9  and that was the reason that she was leaving; in fact, Lisa told
10 me that she liked everyone that worked at Lexington, and that she
11 was happy to finally have a great staff.  Lisa told me that she
12 was leaving the Employer because she wanted to take care of her
13 child and be a stay at home mother.  Lisa did tell me that she
14 did not like being a site director because it was a process to
15 find coverage for absent staff because you find out last minute
16 that people are out and have to find coverage.  This is a problem
17 no matter where you are.  Kelly did not tell me about any
18 specific issues regarding the staff's work performance or time
19 and attendance issues generally or any particular employees' work
20 performance or time and attendance issues specifically.
21     4.   No one ever told me anything about the Employer's
22 discipline policy.  I knew what infractions should result in
23 discipline and termination from my own experience working in
24 preschools.
25     5.   Over my first month at Lexington, I recall a
26 disciplinary issue with Magaly Linares.  Sometime while I was
27 working at Lexington, Maggie should have been watching a young
28 child because the child had been in Maggie's classroom and Maggie

1   took the child to the gym. Instead of watching the child, Maggie
2   was speaking to a parent and the child injured herself. Joanna
3   called me and told me that I had to submit the accident report to
4   her and that I should issue Maggie a written warning for the
5   incident. As a result, I issued Maggie a written warning for
6   failing to watch the child, resulting in injury to the child.
7       6.   Over my first month at Lexington, there were staff
8   absences. I do not recall it being a problem, or any specific
9   person being absent or late frequently. I do not recall Kelly
10  saying anything to me about the staff having excessive absences
11  or latenesses in June 2010. Each day when I would arrive at
12  work, I would listen to the answering machine and that is how I
13  knew who would be out sick on any given day. I would wait for
14  Kelly to arrive at work to find replacements for the teachers.
15  Either Kelly or I would call part-time employees to fill in for
16  our employees that called in sick. If we were unable to obtain
17  coverage that way, Kelly or I would contact other Employer
18  facilities, including the Park Avenue facility and another
19  Employer facility that was staffed but not open for business, to
20  find replacement teachers and assistant teachers. The Employer
21  facility that was staffed but not open for business, was staffed
22  beginning around August 2010. The facility was scheduled to open
23  in September, but because of licensing issues, had been unable to
24  open on time. Kelly or I would call this facility to cover our
25  teachers' absences. From time to time, Kelly and I would cover
26  classrooms that did not have teachers or assistant teachers. I
27  do not recall the absences and latenesses occurring more
28  frequently in the months after June. The absences and latenesses

1  were consistent over June through September 2010.  I did not hear
2  anything from Kelly or any manager or supervisor at Lexington
3  about the staff being absent or late excessively until I was
4  aware of the Union's organizing campaign.
5       7.    Scheduled leave was handled by Kelly, and she would
6  report to me who was going to be on scheduled leave ahead of the
7  leave.  The employees would complete the leave request forms and
8  submit them to Kelly.  Kelly would write the leave schedule on a
9  calendar in the office and then would tell me so that I was aware
10 of who was out.  I have no idea how absences were approved or
11 what the approval process was.  As far as I know, all of the
12 leave that Kelly recorded on the calendar in the office was
13 approved leave.  I have no idea whether or not there is any
14 written record of whether individual leave requests were approved
15 or not.
16      8.    I became aware of the Union's organizing campaign on
17 or around the week before August 2, 2010, when Kelly told me that
18 that there would be a vote at West End about whether or not the
19 staff wanted to be represented by a Union.  She did not say
20 anything else in this conversation.  On or around the same week,
21 Kelly told me that Joanna was coming to Lexington to have a staff
22 meeting.  Kelly said that the staff at Lexington was also trying
23 to get a Union and that we were having a meeting to educate the
24 staff on what Joanna gives the staff and what the Union would
25 give the staff.  I had never seen Joanna at the school before.
26 On or around August 2, 2010, Kelly told me that there was an
27 election at the West End and that the Union won.  I asked how the
28 whole Union thing got started.  Kelly said that there was a

1  person there who was unhappy with Joanna and she had been fired
2  and that's how this all came about.  The conversation ended.
3       9.   On about five occasions in the month of August, Joanna
4  would call the Lexington facility for Kelly or Gina, and I would
5  answer the phone.  Joanna would ask me if I saw any staff talking
6  about the Union.  Joanna would also ask me who was supporting the
7  Union.  I would respond that I did not see any staff talking
8  about the Union and that I did not know who was supporting the
9  Union.  I also recall that Joanna told me that the Union was a
10 bunch of sleazy guys who are taking advantage of our employees by
11 taking money from them, buying them lunch, listening to their
12 needs, promising them things and that the employees were being
13 duped.  Joanna said that the Union wasn't going to get the
14 employees anything anyway.  That is the extent of our
15 conversations and then I would give the phone to Gina or to
16 Kelly.
17      10.  On or around August 5, 2010, there were two meetings
18 held by Joanna in the gym at Lexington.  One meeting was for the
19 teachers and one was for the assistant teachers.  The meetings
20 were held during the staff's lunch time, one around 1 p.m. and
21 one around 2 p.m.  Prior to the meeting, Kelly and I had copied
22 documents that Kelly had received from Joanna to be distributed
23 at the meeting.  I do not recall what the document said
24 specifically, but it went over the benefits provided by Joanna
25 and the benefits that the employees would get with the Union.  I
26 went to the first meeting around the time that it started, but I
27 was in and out of both meeting answering the telephone.  At both
28 meetings were me, Joanna, Gina, Kelly and about six of either the

FORM NLRB-5168
(2-08)

1  head or the assistant teachers at Lexington.  As far as I can
2  recall, the meetings were exactly the same.  I recall that an
3  attendance sheet was passed around at each meeting, but I do not
4  recall who passed around the attendance sheet or who collected
5  it.  Joanna asked the staff to go around in a circle and state
6  their name and position.  The six employees present at each
7  meeting did so.  Then Joanna introduced Gina Cavitolo, Lexington
8  co-director, to the staff as the new co-director.  In the first
9  meeting, when Gina was introduced, it was the first that I had
10 heard about the Employer hiring a co-director.  Joanna said that
11 Gina was there to talk to the employees about Unions because she
12 had experience dealing with Unions from her time in public
13 schools.  Then, I recall, Joanna read from a handout that
14 explained what the employees got from Joanna and what the staff
15 would get from the Union.  Joanna said that she had heard that
16 the staff wanted to join a Union, and that she was angry and hurt
17 by it.  Joanna said that the Employer was like a family and
18 wanted to know why they were doing this to her.  Joanna said that
19 she was giving the employees the best and asked why they would
20 want to go against her.  Joanna said that she was available to
21 discuss any issues that the staff had with them, and that if the
22 employees voted in the Union, she should not be able to talk to
23 them about their issues, it would be out of her hands.  Joanna
24 said that she would not negotiate with the Union.  Then Joanna
25 asked if the staff had any questions or comments.  Dianna DeLeon
26 complained that the staff had not received raises in years.
27 Joanna said that people were entitled to raises, that she would
28 look into it and give everyone who had not received their raises,

1 their retro raises in their new contracts.  Joanna said that she
2 had been unaware that employees had not been receiving raises.
3 Joanna said that if the employees voted in the Union that there
4 would be a wage freeze and that the employees would not get any
5 raises at all.  I also recall Joanna asking if any employees
6 would be at the hearing, but none of the employees responded.  I
7 did not know what hearing she was talking about.  Each of the
8 meetings lasted about an hour each.
9      11.  On or around August 9, 2010, I observed Evelyn
10 Aguirre's classroom and I recall seeing her sitting a lot and not
11 generally being happy.  Over the two weeks before this, Dianna
12 Riopedre spoke to me on one or two occasions and told me that
13 Evelyn Aguirre was not helping her with their students, that
14 Evelyn would keep her phone out on the classroom table and that
15 Evelyn would sit down a lot.  Over this period, I spoke to Evelyn
16 and told her that she could not keep her phone out and needed to
17 help Riopedre more often.  Evelyn's performance improved.  After
18 that, however, Dianna Riopedre continued to complain to me that
19 Evelyn would not perform some of her work duties, like failing to
20 clean out the children's cups.  I had also received some
21 complaints from parents that Evelyn was coming in late and
22 leaving early.  On several occasions, I had to help Dianna
23 Riopedre in her classroom until Evelyn arrived.  I did not ask
24 Kelly for a printout of Evelyn's time clock punches, but because
25 of complaints from Dianna Riopedre, parents, and my observations
26 in their classroom, I issued Evelyn a written warning on or
27 around August 9, 2010.  At this time, I was not aware at this
28 time that Evelyn would be fired in September 2010.  After the

1  August 9, 2010, written warning, Evelyn Aguirre's work
2  performance improved.
3     12.  On approximately two occasions after the August 5,
4  2010 meeting, but I do not recall when, I had conversations with
5  Kelly about who she thought supported the union.  I recall that
6  on these about two occasions, I told Kelly that parents had
7  approached me and told me that they knew some of the teachers
8  wanting a Union, and I would ask Kelly who she thought was
9  involved.  Kelly said that she thought that Magaly Linares was
10 involved, Dianna DeLeon and Reina Peralta.  Kelly said that she
11 definitely knew it was Dianna DeLeon, but she did not tell me how
12 she knew who was involved.  Kelly told me that one of those three
13 employees was friends with an employee at the Employer's West End
14 facility and that this is the reason that they thought that
15 employee was involved.
16    13.  Gina began to work at Lexington full time on or around
17 August 23, 2010.
18    14.  On or around the time that Gina started, August 23,
19 2010, Joanna and Kelly began to talk on the phone several times a
20 day, which was a great increase from before Gina started.  Their
21 conversations were always in Chinese and I did not understand
22 what they were saying.
23    15.  On or around the time that Gina started, August 23,
24 2010, I had collected several requests from staff members
25 regarding classroom assignments over the few weeks before that.
26 Beginning around that time, I started working on classroom
27 assignments.  I would discuss the options with Kelly in an
28 attempt to figure out how to accommodate staff requests and find

1  a good combination of head and assistant teachers for the
2  classrooms for fall 2010. I was assigning all of the head and
3  assistant teachers to classrooms for fall 2010, and was placing
4  all teachers and assistant teachers in classrooms who were
5  employed as of that time. I did not anticipate anyone leaving or
6  anyone being fired as of that time. No one ever told me not to
7  do the staff assignments, but I did not make any classroom
8  assignments for September 2010. I do not know if Gina made
9  classroom assignments for September 2010, and I do not recall if
10 any head or assistant teachers were moved to a new classroom
11 around September 2010. I did not make any classroom assignments
12 for September 2010.
13     16.   On or around the time that Gina started, I recall that
14 she and Kelly would speak in the office about the upcoming
15 employment contracts for the new school year. I recall Kelly
16 telling Gina that she was working on updating the contracts. I
17 recall hearing Kelly tell Gina that Joanna told Kelly to put a
18 hold on giving the employees the employment contracts until after
19 the Union election. Employees would come into the office or walk
20 by the office during lunch time. I recall that on a few
21 occasions, Gina would tell staff members either in the office or
22 in the hallway outside the office that she and Kelly were working
23 on putting together new employment contracts and that either Gina
24 or Kelly would come to speak to them about their new contracts
25 soon. I do not recall seeing either Gina or Kelly speaking to
26 any employees specifically about their renewal employment
27 contracts.

17. I did not recommend to anyone that Reina Peralta, Magaly Linares, Evelyn Aguirre and/or Dianna DeLeon should be fired. I was not consulted regarding the Employer's decision to terminate Reina Peralta, Magaly Linares, Evelyn Aguirre and/or Dianna DeLeon's termination. I do not know how the Employer picked those four employees specifically for termination. I did not know that these employees were to be fired until the day that they were fired. I do not recall the meetings where these employees were informed of the Employer's decision to fire them, or whether I was present at the time. I recall that I knew that Joanna called and said that Reina Peralta, Magaly Linares, and Evelyn were to be fired, on the day that they were fired. I do not recall if I spoke to Joanna, or Gina spoke to Joanna or Kelly spoke to Joanna, but I was told that Joanna called and made the decision to let those employees go on that day. I am not aware of anything in writing about decisions to terminate these four employees, outside of the termination letters signed by Joanna.

18. I did not notice that Reina Peralta's work performance worsened after she resigned on or around August 23, 2010, and I was always walking around in the classrooms observing teachers and students. I am not aware of any complaints by parents or Gina or Kelly about Reina's work performance during this time period. I recall that on one occasion when I was in the office that either Gina or Kelly said that they had seen Reina on the Employer's video surveillance that Reina had used her cell phone in her classroom to text. I do not recall any other complaints about Reina's work performance during this time by Kelly or Gina. The Employer had a policy against texting in the classrooms. I

FORM NLRB-5168
(2-08)

1 was not part of the decision to let Reina go before September 7,
2 and I do not recall speaking to Jill about Reina's work
3 performance at all.

4     19. On about one occasion after Gina started at Lexington,
5 Joanna called me on the phone and asked me if I had noticed that
6 the staff had been out a lot and if I knew about employee
7 attendance. I said that they had not been out often, and I was
8 not aware of their attendance for the year prior because I had
9 just come in June. On one occasion, and I do not recall when,
10 but after Gina started on August 23, 2010, I was sitting at my
11 desk and saw Kelly was talking to Joanna on the telephone. The
12 conversation was mostly in Chinese, but I heard Kelly say
13 attendance and printout. When Kelly hung up the phone, I asked
14 her what she was doing. Kelly said that Joanna had asked her to
15 print out everyone's attendance for the last year. I watched
16 Kelly going through her records to create an attendance record.
17 I did not ask Kelly to print out the attendance records. Kelly
18 did show me a copy of the attendance records at some point. I
19 did not really look at the attendance records that Kelly provided
20 to me.

21     20. On or around September 12, 2010, Joanna called and
22 asked me to meet with her on September 13, 2010, at the Red Apple
23 Preschool in Chinatown around 11:30 a.m. I went to work at
24 Lexington prior to this meeting and went to meet with her around
25 11:30 a.m. I met with Joanna in her office and it was just the
26 two of us. Joanna told me that I was not right for the site
27 director job. I asked what she was talking about. Joanna said
28 that I did not get along with the staff. I said that that is not

FORM NLRB-5168
(2-08)

true. Joanna said that I was not right for the Employer and that I was fired. I did not work for Employer after that date.

21. I did not hear any conversations between Kelly or Gina and the employees about the Union.

I am being provided a copy of this Confidential Witness Affidavit for my review. If, after reviewing this affidavit again I remember anything else that is relevant, or desire to make any changes, I will immediately notify the Board agent. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this statement consisting of 13 pages, including this page. I fully understand its contents, and I certify that it is true and correct to the best of my recollection, knowledge and belief.

_____
Gail Wells

Subscribed and affirmed to me telephonically at New York, New York, on Jan 12, 2010

_____
Nicole Buffalano, Board Attorney
National Labor Relations Board

13